IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

VERDA LEE CROSSWHITE,      )

                                            )         No. 33718-9-III

          Appellant,        )

                                            )

      v.                      )

                                            )         PUBLISHED OPINION

WASHINGTON STATE DEPARTMENT  )

OF SOCIAL AND HEALTH SERVICES,  )

                                            )

          Respondent.       )

SIDDOWAY, J. — Verda Crosswhite appeals a final order of the Department of Social and Health Services affirming as "substantiated" a finding that she mentally abused a vulnerable adult. Clerk's Paper's (CP) at 4. A threshold issue is whether a Department regulation asserts broader agency authority to find abuse than was intended by the legislature. We hold that it does, and that the Department has misinterpreted the law and exceeded its authority.

Ms. Crosswhite also challenges some of the review judge's findings of fact, and because the review judge reached a conclusion opposite of that of the administrative law judge (ALJ), our review is slightly less deferential than it would be otherwise. Properly construed, the statutory definition of "abuse" was not met by the Department's evidence, which failed to demonstrate that Ms. Crosswhite's actions knowingly inflicted injury,

unreasonable confinement, intimidation, or punishment. We reverse the Department's finding of abuse.

We also grant Ms. Crosswhite's motion to strike a statement of additional authorities that cites to an unpublished decision of this court without including what we hold is a needed caveat. We take this opportunity to announce that when citing to unpublished opinions under GR 14.1, either in this court or in the trial court, a party must do more than simply identify the opinion as unpublished. The party must point out that the decision has no precedential value, is not binding on any court, and is cited only for such persuasive value as the court deems appropriate. The party should also cite GR 14.1.

## FACTS AND PROCEDURAL BACKGROUND

In August 2013, the Department of Social and Health Services received a report that Verda Crosswhite, who had worked as a personal caregiver for 26 years, had mentally abused a vulnerable adult. The alleged victim was a woman named Jodi,[1] who had hired Ms. Crosswhite as a personal caregiver about six to eight weeks before the altercation that led to the report. By the time of the report, Jodi had already fired Ms. Crosswhite.

---

[1] Throughout these proceedings, the parties have referred to the alleged victim by her first name only, in order to comply with confidentiality required by WAC 388-71-01250(2).

2

Unlike most of Ms. Crosswhite's clients, Jodi is not elderly. The record does not reveal how old she is, but Ms. Crosswhite described her as "young" and as "about my age." CP at 72, 94. Jodi was categorized as a vulnerable adult by the Department because she was receiving in home services from a licensed agency. Jodi has diabetes, COPD,[2] arthritis and a number of related physical limitations. She is confined to a wheelchair, and needs extensive assistance with most of her activities of daily living. Ms. Crosswhite's duties "included meal preparation, shopping, housework, personal hygiene, assisting in bathing, foot care, medication management, and taking Jodi to doctor's appointments." CP at 213.

Under the "Abuse of Vulnerable Adults Act," chapter 74.34 RCW, the Department is required to investigate reports of abuse of a vulnerable adult. RCW 74.34.063(1), .067. It assigned this investigation to Rebecca Withrow, a social worker with its Adult Protective Services program. If the Department substantiates a report and its "substantiated" finding becomes final, it must place the reported abuser's name on a state registry. WAC 388-71-01280. A final "substantiated" finding may be professionally disqualifying for the abuser, since state law prevents such individuals from being employed in a position or holding a license that involves the care of vulnerable adults or children or from working or volunteering in a position giving them unsupervised access

---

[2] Chronic Obstructive Pulmonary Disease.

3

to vulnerable adults or children. RCW 74.39A.056(2); WAC 388-76-10120(3)-10180(1); RCW 26.44.100(2)(c), .125(2)(e); WAC 388-06A-0110.

The report of mental abuse by Ms. Crosswhite was that she yelled at Jodi in the waiting room of a doctor's office following an appointment that took place on August 1, 2013. Ms. Crosswhite loudly demanded to know whether Jodi told her doctor about her health-threatening eating habits and abuse of pain medication. The incident was reported by Susi Munoz, who is employed by the Department and is Jodi's case manager. According to Department records, Ms. Munoz reported that both Jodi and Ms. Crosswhite called her on August 1, shortly after the altercation. Both were crying. Jodi initially wanted to fire Ms. Crosswhite but decided to think about it over the weekend. Ms. Crosswhite expressed concern about Jodi's self-neglect and her untruthfulness with her doctors.

Three employees of the doctor's office confirmed to Ms. Withrow that the altercation took place and that one of the employees, Guille Gonzalez, a medical assistant, told Ms. Crosswhite to stop. The altercation embarrassed and upset Jodi, who was reduced to tears in the waiting room, where patients were present in addition to staff. On leaving the office, Jodi and Ms. Crosswhite remained outside for a while because Jodi wanted to smoke a couple of cigarettes before Ms. Crosswhite took her home. She continued to cry outside. We describe the facts further in discussing Ms. Crosswhite's substantial evidence challenge in section II of our analysis.

4

At the conclusion of Ms. Withrow's investigation, she found the report of abuse to be substantiated. Ms. Crosswhite appealed.

The ALJ who heard the appeal reversed Ms. Withrow's determination, finding that while Ms. Crosswhite acted inappropriately in yelling at Jodi, she did so out of concern for her health, had Jodi's best interest in mind, and that the Department failed to show that Ms. Crosswhite's actions willfully caused injury, unreasonable confinement, intimidation, or punishment, as required to constitute abuse.

The Department appealed. Following a full review of the record, the review judge affirmed the Department's finding. It dispensed with the ALJ's findings about Ms. Crosswhite's concerns, motives and intent. Applying Department regulations that interpret and reframe certain provisions of the Abuse of Vulnerable Adults Act, the review judge concluded that the ALJ misapplied the law.

Ms. Crosswhite appeals.

## ANALYSIS

Washington's Administrative Procedure Act, chapter 34.05 RCW (APA) governs judicial review of an agency action. *Alpha Kappa Lambda Fraternity v. Wash. State Univ.*, 152 Wn. App. 401, 413, 216 P.3d 451 (2009). Of nine statutory bases on which an agency order can be reversed, Ms. Crosswhite argues that three apply: (1) the Department's final order is outside its statutory authority because it relies on an improperly broadened definition of the statutory term "abuse", (2) the Department

5

erroneously interpreted and applied that statutory term, and (3) substantial evidence does not support the finding that Ms. Crosswhite's conduct met the statutory definition of abuse. Br. of Appellant at 2; RCW 34.05.570(3)(b), (d) and (e).

Consistent with RCW 34.05.464, the Department provides by rule that the decision of an ALJ in an appeal from a substantiated finding of abuse of a vulnerable adult is an initial order, subject to review by a reviewing officer. WAC 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(3). The APA provides that a reviewing officer generally exercises "all the decision-making power that the reviewing officer would have had to decide and enter the final order [that] the reviewing officer presided over the hearing." RCW 34.05.464(4). This is subject to the proviso that "[i]n reviewing findings of fact by presiding officers, the reviewing officers shall give due regard to the presiding officer's opportunity to observe the witnesses." *Id.*

We review the review judge's final order, not the initial order entered by the ALJ. Where the ALJ and the review officer enter contradictory findings, we do not accord the deference to the ALJ that we would accord to the trier of fact in a nonadministrative matter, because the review officer has broad decision-making authority and is intended to bring the agency's expertise to bear. As discussed further below, however, the review judge may commit an error of law if he or she fails to give due regard to findings of the ALJ that are informed by the ALJ's ability to observe the witnesses.

6

We review agency action from the same position as the superior court, and review the administrative record rather than the superior court's findings or conclusions. *Edelman v. State*, 160 Wn. App. 294, 303, 248 P.3d 581 (2011). Findings of fact from the agency's final order are reviewed under the substantial evidence test and will be upheld if supported by a sufficient quantity of evidence to persuade a fair-minded person of the order's truth or correctness. *Raven v. Dep't of Soc. & Health Servs.*, 177 Wn.2d 804, 817, 306 P.3d 920 (2013).

The APA's directive that we review whether an order is supported "by evidence that is substantial when viewed in light of the *whole record* before the court" requires us to look beyond whether there is merely some evidence that supports the agency order. RCW 34.05.570(3)(e) (emphasis added). As the United States Supreme Court observed in construing like language in the federal administrative procedure act, "The substantiality of evidence must take into account whatever in the record fairly detracts from its weight. This is clearly the significance of the requirement . . . [in APA § 706] that courts consider the whole record." *Universal Camera Corp. v. Nat'l Labor Relations Bd.*, 340 U.S. 474, 488, 71 S. Ct. 456, 95 L. Ed. 456 (1951). "[E]vidence in support of an agency finding must be sufficient to support the conclusion of a reasonable person after considering all of the evidence in the record as a whole, not just the evidence that is consistent with the agency's finding." 2 RICHARD J. PIERCE, JR., ADMINISTRATIVE LAW TREATISE § 11.2, at 979 (5th ed. 2010).

7

Ms. Crosswhite bears the burden of showing invalid action. RCW 34.05.570(1)(a).

Relief is available only if she shows she was substantially prejudiced by the action

complained of. RCW 34.05.570(1)(d).

### I. The Department's regulatory definition of "abuse" conflicts with the statutory definition provided by RCW 74.34.020(2)

We first address Ms. Crosswhite's arguments that the Department's regulatory

definition of "abuse" erroneously interprets RCW 74.34.020(2) and that in applying it,

the Department exceeded its authority.

We review challenges that an order is outside the statutory authority or jurisdiction

of the agency and that the agency has erroneously interpreted or applied the law de novo,

but "give the agency's interpretation of the law great weight where the statute is within

the agency's special expertise." *Cornelius v. Dep't of Ecology*, 182 Wn.2d 574, 585, 344

P.3d 199 (2015). Deference "is inappropriate when the agency interpretation conflicts

with the statute." *Brown v. Dep't of Soc. & Health Servs.*, 145 Wn. App. 177, 183, 185

P.3d 1210 (2008) (citing *Dep't of Labor & Indus. v. Granger*, 159 Wn.2d 752, 764, 153

P.2d 839 (2007)).

WAC 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(1) provides that in adjudications arising in Department

programs, ALJs and review judges must first apply the Department's administrative

regulations. Only if no Department rule applies are ALJs and review judges to decide an

issue according to other legal authority and reasoning. WAC 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(2). Ms.

8

Crosswhite argues that the Department regulation applied by the review judge differed in material respects from the statutory definition of "abuse" provided by RCW 74.34.020(2).

As always in interpreting a statute, "[t]he court's fundamental objective is to ascertain and carry out the Legislature's intent." *Dep't of Ecology v. Campbell & Gwinn, LLC*, 146 Wn.2d 1, 9, 43 P.3d 4 (2002). "[I]f the statute's meaning is plain on its face, then the court must give effect to that plain meaning as an expression of legislative intent." *Id.* at 9-10.

> As relevant here, chapter 74.34 RCW provides that "abuse" means
>
> the willful action or inaction
>
> that inflicts injury, unreasonable confinement, intimidation, or punishment
>
> on a vulnerable adult. . . .
>
> Abuse includes sexual abuse, mental abuse, physical abuse, and exploitation of a vulnerable adult.

RCW 74.34.020(2). Before amendment in 2015, the statute defined "mental abuse" as including willful verbal abuse, and as including "verbal assault that includes ridiculing, intimidating, yelling or swearing." Former RCW 74.34.020(2)(c) (2013).

The first point of contention between the parties is the meaning of "willful."

9

*A. "Willful" action or inaction*

"Willful" is not defined in chapter 74.34 RCW. While the term has been given many meanings,[3] a meaning often currently applied in Washington cases is that an action is willful if "a person acts knowingly with respect to the material elements of an offense." *State v. Bauer*, 92 Wn.2d 162, 168, 595 Wn.2d 544 (1979); *Bishop v. City of Spokane*, 142 Wn. App. 165, 171, 173 P.3d 318 (2007). RCW 9A.08.010(4), which defines types of culpability for purposes of the criminal code, defines "wil[l]fulness"[4] in this manner "unless a purpose to impose further requirements plainly appears." It is a material element of committing abuse of a vulnerable adult that the perpetrator "inflicts injury, unreasonable confinement, intimidation, or punishment." RCW 74.34.020(2). Applying this common definition of "willfully," an abuser must knowingly inflict injury, unreasonable confinement, intimidation or punishment.

This construction is consistent with our decision in *Brown*, 145 Wn. App. at 183,

---

[3] *See Markam Grp., Inc. v. Emp't Sec. Dep't*, 148 Wn. App. 555, 562-63, 200 P.3d 748 (2009) ("' Willful' means intentional behavior done deliberately or knowingly, where you are aware that you are violating or disregarding the rights of your employer or a co-worker."); *New York Life Ins. Co. v. Jones*, 86 Wn.2d 44, 47, 541 P.2d 989 (1975) ("Willfully means intentionally and designedly."); *Smith v. Shiflett*, 66 Wn.2d 462, 467, 403 P.2d 364 (1965) (finding that the element of willfulness may be satisfied by reckless disregard of probable consequences but does not require intent on the part of a trespasser); *State v. Latham*, 183 Wn. App. 390, 403, 335 P.3d 960 (2014) (finding "willful" requires only general intent in the context of manslaughter, while specific intent is required in the context of homicides).

[4] We use the modernly-preferred "willful" throughout, recognizing that older statutes and cases often use the formerly-preferred "wilful."

which reversed a Department finding of physical abuse against a vulnerable adult. That decision focused primarily on the meaning of "abuse" rather than the meaning of "willful." In construing "abuse," this court adopted the reasoning of the Alaska Supreme Court in *R.J.M. v. State*, 946 P.2d 855, 863 (Alaska 1997) that "abuse" requires harm resulting from "improper action." As the Alaska court observed, both the terms "abuse" and "neglect" "imply the potential for infliction of harm." *Id.* at 862.

Here, focusing on the culpability required for "willful" conduct, an actor's knowing action or inaction and knowing "inflict[ion of] injury, unreasonable confinement, intimidation or punishment," RCW 74.34.020(2), makes action or inaction "improper," as that term was used in *Brown*.

Defining "willfulness" to require the knowing infliction of one of the statutory harms is also consistent with one of Black's definitions of "willful": "A voluntary act becomes willful, in law, only when it involves conscious wrong or evil purpose on the part of the actor, or at least inexcusable carelessness, whether the act is right or wrong." BLACK'S LAW DICTIONARY 1834 (10th ed. 2014).[5]

By contrast, the Department regulation applied in this case defines "willful" to mean

> [T]he nonaccidental action or inaction by an alleged perpetrator that he/she

---

[5] Alternatively, Black's defines "willful" as "Voluntary and intentional, but not necessarily malicious." *Id.*

11

knew or reasonably should have known could cause harm, injury or a negative outcome.

WAC 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. Ms. Crosswhite contends the elements "nonaccidental," "knew or reasonably should have known" and "negative outcome" in the Department's definition expand its authority to make professionally disqualifying findings of abuse beyond what was intended by the legislature. "[R]ules that extend a statute's punitive reach are an invalid exercise of agency power." *Marcum v. Dep't of Soc. & Health Servs.*, 172 Wn. App. 546, 558, 290 P.3d 462 (2012).[6]

### *"Nonaccidental"*

We disagree with Ms. Crosswhite that the term "nonaccidental" conflicts with the legislature's use of the term "willful" in defining "abuse." "Nonaccidental" is reasonably synonymous with "willful." Webster's provides the following relevant definitions of "willful":

---

[6] The Department argues that chapter 74.34 RCW is remedial and should be broadly construed. At oral argument, it contended that the statutes applied to Ms. Crosswhite's appeal of the Department's "substantiated" finding are not punitive, because it is chapter 74.39A RCW, not chapter 74.34 RCW, that disqualifies Ms. Crosswhite from working as a long term care worker.

While chapter 74.34 RCW is remedial in making available protective orders and a claim for damages, its provisions dealing with Department investigations, findings, and publication of substantiated findings for licensing disqualification, employment disqualification, and criminal prosecution purposes, are punitive. This court has also construed provisions under which the Department makes professionally disqualifying findings applicable to licensing to be in derogation of the common law, requiring strict construction. *Brown v. Dep't of Soc. & Health Servs.*, 190 Wn. App. 572, 591-92, 360 P.3d 875 (2015).

> **2** : done deliberately : not accidental or without purpose : INTENTIONAL,
> SELF-DETERMINED . . . **4** *obs* : done of one's own free will : not
> compulsory.

WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 2617 (1993). Courts may discern

the plain meaning of nontechnical statutory terms from their dictionary definitions. *State*

*v. Kintz*, 169 Wn.2d 537, 547, 238 P.3d 470 (2010) (quoting *State v Cooper*, 156 Wn.2d

475, 480, 128 P.3d 1234 (2006).

It is critical to properly identify the "knowing action" that must be nonaccidental,

however. As previously discussed, under RCW 9A.08.010(4), "[a] requirement that an

offense be committed wil[l]fully is satisfied if a person acts knowingly *with respect to the*

*material elements of the offense.*" (Emphasis added.) Yelling at a vulnerable adult that is

nonaccidental and that nonaccidentally inflicts a type of harm identified by RCW

74.34.020(2) is willful. Yelling that is nonaccidental but that causes a statutory harm

*accidentally* or *without purpose* is not.

The Department's position that only the actor's conduct, not her intent, needs to be

nonaccidental is contrary to *Brown*, in which this court held that "the definition of

'abuse' . . . require[s] a willful action to inflict injury." 145 Wn. App. at 183. The

Department dismisses that language, arguing that the court was merely "paraphrasing"

RCW 74.34.020(2) in *Brown* and did so incorrectly, since the statute speaks only of

action or inaction "that" inflicts injury, rather than action or inaction "to" inflict injury.

The Department is wrong. In stating that an abuser requires willful action "to" inflict

13

injury, *Brown* was not paraphrasing the statute, it was construing what is required to commit abuse.

The Department also argues that this court's decision in *Goldsmith v. Department of Social & Health Services* cites *Brown* and holds that specific intent to cause harm is not required. Br. of Resp't at 16-17 (citing *Goldsmith*, 169 Wn. App. 573, 586, 280 P.3d 1173 (2012)). We disagree. As noted in *Goldsmith*, the appellant in that case did not explain how the Department committed any legal error, so the issue presented in this case was not before the court. 169 Wn. App. at 583. Moreover, in the discussion of *Brown* to which the Department refers, the *Goldsmith* court stated that "if . . . harm results from *improper action*, the action is *abusive*"—the court's concern in *Brown*. *Id.* at 586.

In addressing "willfulness," what the *Goldsmith* court deemed important was not that an adult son's repeated arguments with his elderly father were voluntary, but was, instead, how often heated exchanges between the son and the father had occurred, how upset the father would become, the foreseeability that "lengthy and repeated yelling matches with a 98-year-old [man] in declining health . . . could cause harm or injury," and the court's conclusion that "Goldsmith knew or should have known that they caused his father considerable stress." *Id.* at 585. The court's inference that the son knew he was inflicting a statutory harm was necessary to Division Two's finding that his action was willful.

The Department's use of "nonaccidental" to define "willful" is not erroneous if

14

properly construed to require knowing infliction of a statutory harm.

*"Knew or reasonably should have known"*

By broadening the meaning of "willful" to include action or inaction that an alleged perpetrator knew "or reasonably should have known" could cause harm or injury, the Department's regulation reduces the standard of culpability to negligence. The Department cites the definition of "knowledge" in RCW 9A.08.010 in contending that "[c]riminal law . . . holds a defendant charged with willful conduct to the standard of a reasonable person in the defendant's situation." Br. of Appellant at 20.

We agree that RCW 9A.08.010 is reasonably considered in construing standards of culpability. We rely on it ourselves in construing "willful" conduct. But the Department overlooks the limiting construction that our Supreme Court placed on the statute's definition of "knowledge" in *State v. Shipp*, 93 Wn.2d 510, 610 P.2d 1322 (1980).

RCW 9A.08.010(1)(b) provides, as to "knowledge," that:

A person knows or acts knowingly or with knowledge when:

(i) he or she is aware of a fact, facts, or circumstances or result described by a statute defining an offense; or
(ii) he or she has information which would lead a reasonable person in the same situation to believe that facts exist which facts are described by a statute defining an offense.

In *Shipp*, the court held that the definition in subsection (b)(ii) could be construed to have three possible meanings, only one of which would be constitutional.

It held that "[t]he word 'knowledge' has an ordinary and accepted meaning," and, "statutory redefinition of knowledge to mean negligent ignorance would completely contradict the accepted meaning." *Shipp*, 93 Wn.2d at 516. Since "[s]tatutes which define crimes must be strictly construed according to the plain meaning of their words to assure that citizens have adequate notice of the terms of the law," the court held that RCW 9A.08.010(1)(b) could not be construed as redefining "knowledge." *Id.* at 515-16.

An alternative construction of RCW 9A.08.010(1)(b) would be that it creates a mandatory presumption of knowledge when negligent ignorance is proved. But that construction would also be unconstitutional, since presumptions that direct the jury to find the presence of a criminal element absent proof of that element violate the requirement of due process. *Id.* at 515 (citing *In re Winship*, 397 U.S. 358, 90 S. Ct. 1068, 25 L. Ed. 2d 368 (1970)).

The third, and the only permissible construction of RCW 9A.08.010(1)(b), is that it creates a permissible inference. As *Shipp* and other Washington decisions have observed, if evidence persuades a fact finder that a reasonable person would have known something, then the fact finder may infer a defendant's "knowledge" from that evidence as a matter of logical probability. *State v. Bryant*, 89 Wn. App. 857, 871, 950 P.2d 1004 (1998) (citing *Shipp*, 93 Wn.2d at 517). But those cases hold that the fact finder "must still find subjective knowledge." *Shipp*, 93 Wn.2d at 517; *and see* 11 WASHINGTON PRACTICE: WASHINGTON PATTERN JURY INSTRUCTIONS: CRIMINAL § 10.02, at 206 (3d

16

ed. 2008) (defining "knowledge" and "knowingly").

The statutes under which Ms. Crosswhite was professionally disqualified were not criminal statutes. But we still apply plain meaning analysis. As held in *Shipp*, to define "knowledge" as meaning negligent ignorance completely contradicts the accepted meaning of the word. *Shipp*, 93 Wn.2d at 516.

In treating negligence as knowledge, the Department erroneously interpreted the law. Its application of a negligence standard exceeds its statutory authority.

### *"Negative outcome"*

Finally, adding "negative outcome" to the types of harm that will support a professionally disqualifying finding of abuse is overly broad and irreconcilable with RCW 74.34.020(2). This court first expressed reservations about the reference to "negative outcomes" in *Goldsmith*, but because the language was not necessary to the outcome of that case, the court did not address the issue further. 169 Wn. App. at 585 n.1.

The Department argues that adding "negative outcome" to its definition was in an effort to "implement the legislative intent that the definition of 'abuse' be as broad as possible." Br. of Resp't at 21. It cites no authority for that ostensible legislative intent. Neither the statement of legislative purpose nor the findings adopted in enacting the Abuse of Vulnerable Adults Act support the Department's position. *See* LAWS OF 1999, ch. 176 § 1-2 (codified in part at RCW 74.34.005). The legislative purpose was, instead,

17

to combine statutory provisions relating to protection of vulnerable adults into one statute so that the Department and law enforcement agencies could investigate complaints of mistreatment and provide protection to vulnerable adults. *Id.*; *Brown*, 145 Wn. App. at 182.

While deferring to agency expertise where appropriate, this court has consistently rejected Department interpretations of statutes that broaden its authority to take punitive action. We have already discussed the 2008 decision in *Brown*, in which this court rejected the Department's view that it was authorized to make a substantiated finding of physical abuse even though Ms. Brown intervened in a situation with a violent client to take actions that, while physical and objectionable to the client, were "protective, not injurious or ill-intended." *Id.* at 183.

In *Marcum*, this court rejected a Department interpretation of the legislature's definition of "negligent treatment" of a child in chapter 26.44 RCW, the Child Abuse and Neglect Act. A Department rule identified categories of per se negligent treatment, in disregard of the legislature's language that negligent treatment must involve conduct "that evidences a serious disregard of consequences of such magnitude as to constitute a clear and present danger to a child's health, welfare, or safety.'" *Marcum*, 172 Wn. App. at 555 (quoting former RCW 26.44.020(14) (2010)). This court held that the statutory standard for negligent treatment was unambiguous and that the Department "lacks authority . . . that fundamentally shifts the standard required to make a neglect finding."

18

*Id.* at 559.

Last year, in [*Ashley*] *Brown* (we modify the case name to distinguish it from this court's 2008 *Brown* decision), this court rejected the Department's incorporation of a "reasonable person" standard into the legal standard required to uphold a finding of neglect or abuse against a parent. *Brown v. Dep't of Soc. & Health Servs.*, 190 Wn. App. 572, 587, 360 P.3d 875 (2015). In addition to a textual basis for the decision, the court found "[g]ood reason . . . to reject a negligence benchmark," for "[a] negligence standard could place every Washington parent in jeopardy because what is 'reasonable' under a negligence regime varies depending on the situation and actors involved." *Id.* at 593.

In this case, the Department's broadening of harms covered by RCW 74.34.020(2) in order to make the definition of abuse "as broad as possible" conflicts with statutory language. The legislature unambiguously identified four types of harm that constitute "abuse," without using language such as "including" or "not limited to" that would signal that the harms identified are nonexclusive. "Negative outcome" is not only outside the unambiguous scope of the statute but is hopelessly vague. As we observed at oral argument, it does not even convey who must suffer the negative outcome: The vulnerable adult? A family member or friend? The Department? Society?

The Department's reliance on "negative outcome" as a basis for finding abuse exceeded its statutory authority.

19

## II. Substantial evidence

If Ms. Crosswhite had challenged only the Department's application of its broad definition of "willful," we would remand so that the agency could apply the correct definition. But in this case, Ms. Crosswhite also argues that substantial evidence does not support the agency's final order. In addition to assigning error to some of the review judge's own findings of fact, she argues that the review judge failed to give due regard to the ALJ's opportunity to observe the witnesses as required by RCW 34.05.464(4).

If the review judge and the ALJ made findings on the facts relevant to the proper definition of "willful", then Ms. Crosswhite is entitled to a decision on her evidence sufficiency challenge. They did. In applying the Department's regulatory definition of "willful," the review judge addressed whether Ms. Crosswhite "knew or should have known" that her actions would inflict injury on Jodi and made numerous findings on that score. Any facts found by the review judge as supporting an ultimate finding that Ms. Crosswhite "knowingly inflicted injury" on Jodi would have been included as facts supporting the review judge's ultimate finding that Ms. Crosswhite "knew or should have known" that she was inflicting injury. Since the factual findings are adequate for substantial evidence review, Ms. Crosswhite does not have to settle for an agency do-over.

*A. Deference owed when findings of the reviewing and presiding
officers conflict*

In *Tapper v. Employment Security Department*, 122 Wn.2d 397, 403, 858 P.2d 494 (1993), our Supreme Court rejected the contention that a reviewing officer was legally bound by factual findings of the ALJ who presided over the initial hearing. The court held that the reviewing officer "has the power to make his or her own findings of fact and in the process set aside or modify the findings of the ALJ." *Id.* at 404. In so holding, it looked to case law applying the federal administrative procedure act, which it characterized as "provid[ing] persuasive support" for its reading of the APA. *Id.* at 405. *See also* RCW 34.05.001 ("The legislature . . . intends that the courts should interpret provisions of this chapter consistently with decisions of other courts interpreting similar provisions of other states, the federal government, and model acts.") The court emphasized that Ms. Tapper's appeal did not raise a substantial evidence challenge to the review officer's findings, but argued only that a reviewing officer always lacks authority to reject the findings of an ALJ. *Id.* at 403, 407.

Where, as here, a party contends that substantial evidence does not support the review judge's findings, the fact that the presiding judge made different findings can matter to our review. As the United States explained in its seminal decision in *Universal Camera Corp. v. National Labor Relations Board*:

[E]vidence supporting a conclusion may be less substantial when an impartial, experienced examiner who has observed the witnesses and lived

21

with the case has drawn conclusions different from the Board's than when he has reached the same conclusion. The findings of the examiner are to be considered along with the consistency and inherent probability of testimony.

340 U.S. at 496. "The substantiality of the evidence is to be assessed specifically 'in light of the whole record,' which includes transcripts of the agency hearing and the credibility and demeanor findings of the presiding officer." William R. Andersen, *The 1988 Washington Administrative Procedure Act—An Introduction*, 64 WASH. L. REV. 781, 816 (1989) (footnote omitted) (quoting RCW 34.05.570(3)(e)).

Accordingly, when a reviewing officer reverses an ALJ on factual matters, case law holds that "we examine the disagreement with a gimlet eye." *Aggregate Indus. v. Nat'l Labor Relations Bd.*, 824 F.3d 1095, 1100 (D.C. Cir. 2016); *accord Plaza Auto Ctr., Inc. v. Nat'l Labor Relations Bd.*, 664 F.3d 286, 291 (9th Cir. 2011) ("Our review is more 'searching' in instances where the Board's findings or conclusions are contrary to those of the ALJ."); *Slusher v. Nat'l Labor Relations Bd.*, 432 F.3d 715, 727 (7th Cir. 2005) ("[W]e must consider the ALJ's views in deciding whether the Board's order is supported by substantial evidence.").

This is especially true where a reviewing officer has rejected "primary" rather than "secondary" inferences. The author of a leading treatise explains the distinction:

A primary inference involves a determination of whether a witness' testimony as to an allegedly observed fact is true, e.g., did a managerial employee order the union organizer to leave the premises, as the witness claimed to have observed? A secondary inference involves application of

22

judgment, discretion, or expertise to testimony, e.g., does the method of calculating damages proposed by an expert witness best serve the purposes of the regulatory regime implemented by the agency?

2 PIERCE, *supra*, at 992. Professor Pierce observes that "[c]redibility based on witness's demeanor is far more important with respect to primary inferences." *Id.* On the other hand, "ALJ findings should carry little, if any, weight with respect to secondary inferences." *Id.*

Finally, case law holds that when an agency departs from ALJ findings, "it must explain why." *ITT Cont'l Baking Co. v. Fed. Trade Comm'n*, 532 F.2d 207, 219 (2d Cir. 1976). *See also Gen. Dynamics Corp. v. Occupational Safety & Health Review Comm'n*, 599 F.2d 453, 463 (1st Cir. 1979) ("the ALJ's decision to give or deny credit to a particular witness' testimony should not be reversed absent an adequate explanation of the grounds for the reviewing body's source of disagreement"); *Int'l Bhd. of Teamsters v. Nat'l Labor Relations Bd.*, 587 F.2d 1176, 1181 (D.C. Cir. 1978) (agency's explanation for rejecting ALJ's findings is needed to determine whether agency's findings are supported by substantial evidence).

## B. Challenged findings

Ms. Crosswhite assigns error to 18 of the review judge's findings or conclusions in support of 3 challenges to the sufficiency of the evidence: she argues that there is no substantial evidence that she intended to inflict injury; that her actions constituted a verbal assault; or that Jodi sustained injury, unreasonable confinement, punishment, or

23

intimidation. Br. of Appellant at 24. We find the lack of substantial evidence that Ms.

Crosswhite intended to inflict injury to be dispositive.

> *1. The review judge's findings fail to give due regard to the ALJ's*
> *opportunity to observe the witnesses*

The review judge concluded that the requirement of willfulness was satisfied

because "yelling and screaming in front of a room full of people . . . was not an

accidental occurrence" and Mrs. Crosswhite "knew or should have known [her actions]

would cause harm or a negative outcome." CP at 13 (Conclusions of Law (CL) 11, 13).

It rejected the ALJ's findings of fact as to Ms. Crosswhite's concerns, motives and intent.

The ALJ had the opportunity to observe Ms. Crosswhite's examination and cross-

examination. She admitted that she yelled at Jodi about whether she had been honest

with her doctor and she testified to the reasons why. According to Ms. Crosswhite, early

on Jodi told her that she wanted to "start doing better"; she wanted to "start walking" and

"start being normal." CP at 94. Ms. Crosswhite initially believed Jodi was serious about

making changes and Ms. Crosswhite wanted to help her. She thought that improving

Jodi's living environment outside her bedroom would motivate Jodi to get out of bed, so

she arranged for volunteers to donate materials and services to wash and paint the walls

in Jodi's living room and bathroom, clean her carpets, and cut back an overgrown tree

that was blocking light from the home.

Despite this, Ms. Crosswhite testified, Jodi continued to be self-neglectful.

According to Ms. Crosswhite, Jodi stayed in bed most of the time, heavily medicated. Jodi consistently failed to monitor her blood sugar. Jodi did not eat well even when Ms. Crosswhite provided healthy food. Instead, Jodi survived for the most part on regular Coca Cola and presweetened iced tea. Ms. Crosswhite testified to one occasion when Jodi sent her to the store for a gallon of orange juice "because she had bottomed out." CP at 85. When Ms. Crosswhite returned and poured her a glass of juice, Jodi made Ms. Crosswhite add half a cup of sugar to it. Ms. Crosswhite believed that the way Jodi was dealing with her diabetes was "totally dangerous." *Id.* She testified:

> [S]he was playing Russian roulette. And I watched her do this, and I was getting really scared. You know, I was scared for myself and I was scared for her. Because I didn't know if one morning I was going to go in there, and maybe she did—had an insulin reaction, and maybe didn't make it.

*Id.*

In taking Jodi to doctor's appointments, Ms. Crosswhite said she observed her being untruthful about her level of activity because her pain medications might be reduced if her doctors knew how much time she was spending in bed. Ms. Crosswhite said she worried that Jodi's unwillingness to be candid about her diet and inattentiveness to her blood sugar levels would prevent her from getting needed advice on matters that were critical to caring for her diabetes.

The ALJ heard from three individuals who Ms. Crosswhite arranged to donate materials or services to clean up Jodi's home and three former clients or

25

family members of clients for whom Ms. Crosswhite had provided personal care.

A program coordinator for Volunteer Chore Services testified that Jodi's home had needed "some pretty significant cleaning." CP at 164. She testified that Ms. Crosswhite arranged through her for a church group from Oregon to provide 120 hours of volunteer work in Jodi's home and yard, reporting back that "[the] project was very difficult, but so worth it," and that "[Ms. Crosswhite] was amazing" and "affirmed us." CP at 167. The program coordinator testified that Ms. Crosswhite was "a strong advocate for . . . her client." *Id.* The owner of a carpet cleaning service who Ms. Crosswhite enlisted testified to the extent of cleaning required to deal with badly soiled carpets, which he also treated with a germicide deodorizer to address pet stains and cigarette odor.

Three of Ms. Crosswhite's former clients or client family members testified to her friendliness, helpfulness, and her respect for their privacy. Their testimony was consistent with Department case notes that when Ms. Withrow asked Ms. Munoz, Jodi's case manager, "if they have ever had a problem with [Ms. Crosswhite]," Ms. Munoz answered no, adding that Ms. Crosswhite "takes care of another individual on her case load and does quite well." CP at 68.

The ALJ observed the testimony of Guille Gonzalez, the medical assistant who intervened to stop Ms. Crosswhite from yelling at Jodi. Ms. Gonzalez was critical of Ms. Crosswhite's behavior on August 1. But she testified that on two prior occasions, Ms. Crosswhite had privately expressed concern to her that Jodi was too heavily medicated

26

and brought in Jodi's medications so that Ms. Gonzalez could see what they were and check with the doctor. Although the doctor ultimately determined that some of the bottles of medication were simply duplicates of single prescriptions, Ms. Gonzalez testified that she believed Ms. Crosswhite had Jodi's best interest in mind and it was reasonable for her to raise the concern with the medical staff.

The ALJ observed the testimony of Ms. Munoz, who had heard from both Jodi and Ms. Crosswhite on August 1 and reported their altercation to the Department. She testified that when she first heard from Jodi on the day of the altercation, Jodi told her that she and Ms. Crosswhite "were going to try to work through it." CP at 131. Ms. Munoz testified that Ms. Crosswhite had been "very kind" to arrange for the cleaning, painting and yard work at Jodi's home and was "among . . . an elite group of caregivers." CP at 136-37.

The ALJ observed the testimony of Ms. Withrow, who testified to her interviews of Jodi. (Jodi was not called as a witness.) While testifying to how very upset Jodi was about being yelled at about "junk food . . . on [her] windowsill" and about her refusal to control her diabetes,[7] Ms. Withrow also testified about her notes of what Jodi said

---

[7] Department case notes suggest that Jodi might have been more upset by the altercation with Ms. Crosswhite than would have been foreseen. Notes of Ms. Withrow's interviews of Jodi state that in explaining why she was so upset, Jodi "said she has had an abusive past and [Ms. Crosswhite's] actions . . . just brought up all that old stuff." CP at 69. Similar entries about the prior abuse appear elsewhere, including in connection with

27

happened after she and Ms. Crosswhite left the doctor's office. CP at 69. According to

her case notes:

> They sat out on the bench and she said [Ms. Crosswhite] trie[d] to calm her down, and told her she cared about her and that she was worried about her health and her poor eating habits. She said the medical staff came out and checked on her and she was still crying but she told them it was OK. She ask[ed Ms. Crosswhite] to take her home.

*Id.* Jodi told Ms. Withrow that when she called Ms. Munoz to report what had happened,

she talked about discharging Ms. Crosswhite as her caregiver but then said, "[L]et me

think about this over the weekend." *Id.* (Jodi discharged Ms. Crosswhite several days

later, after Ms. Crosswhite questioned Jodi's husband about her sleeping and activity.

She was angry that Ms. Crosswhite was "going behind her back." *Id.*)

Based on this and other evidence, the ALJ found that Ms. Crosswhite was "very

involved with Jodi." CP at 37 (Finding of Fact (FF) 18). He found that Ms. Crosswhite

was "concerned with Jodi's medications" and identified the steps she had taken to

determine whether Jodi was taking more medication than she should. CP at 38 (FF 19).

He found that Ms. Crosswhite "was afraid for Jodi's health and believed that she was not

telling the doctor the truth about her condition and what she was eating." *Id.* (FF 21).

He entered the following additional findings and conclusions:[8]

---

Jodi's statement that she was "emotionally destroyed." CP at 68, 73. Some of Ms. Withrow's notes related to Jodi's report of an abusive past are redacted.

[8] In reviewing both the initial and final orders, we treat mislabeled findings of fact or conclusions of law as what they actually are, and review them accordingly. *Willener v.*

> The Appellant did yell at the client, Jodi on August 1, 2013. She was concerned that Jodi had failed to notify the doctor of her actual condition. . . . She also told Jodi, "I'm not going to sit around and watch you kill yourself. I'm calling my boss and just quit."

CP at 40 (Conclusion of Law (CL) 10).

> The Department did not present any testimony or evidence that established that the Appellant knew or should have known what the outcome of her verbal statements would be. There was also no testimony or evidence that there was harm, injury or negative outcome. The Appellant was seeking a positive outcome for Jodi by her actions to assure that she was receiving the proper medical care.

*Id.* (CL 12).

> The Appellant's actions are consistent with a person trying to make sure the client is being truthful with the doctor about her health. . . . The Appellant's intent [i]s substantiated by her testimony and the abundance of supporting testimony is that she had the best interest of her clients at heart.

*Id.* (CL 13).

> [T]he Appellant's action was not intended to inflict injury but rather in frustration with the client's lack of truthfulness with her doctor and the consequences to the client of not being truthful.

CP at 41 (CL 16).

The ALJ concluded the Department failed to establish by a preponderance of the evidence that Ms. Crosswhite acted in a willful manner intended to harm, injure or cause a negative outcome to Jodi. CP at 41 (CL 14).

The ALJ's findings that Ms. Crosswhite did not knowingly inflict injury but acted

---

*Sweeting*, 107 Wn.2d 388, 394, 730 P.2d 45 (1986).

out of concern and frustration is supported by Ms. Crosswhite's explanation of her actions. Evidence from Ms. Munoz and the six defense witnesses provided substantial support for her explanation of the concerns that motivated her to speak out, and her intentions.

We note that the ALJ did not identify which of his findings were based substantially on credibility of evidence or demeanor of witnesses, which is one of the order drafting requirements imposed by RCW 34.05.461(3). He should have. The absence of such an identification matters on review if a finding could have been based on something other than weighing live witness testimony. Our concern in reviewing agency action is to reach a just result, however, and to that end we will rely on the best informed findings in the record. Where findings were necessarily based on weighing live witness testimony, we will treat them as such even if the order drafting requirements of RCW 34.05.461(3) have not been satisfied.

The review judge either dropped the ALJ's findings as to Ms. Crosswhite's concerns, motives, and intent from the final order or indicated that they were merely Ms. Crosswhite's testimony. She failed to explain why the ALJ's assessment of the witnesses' testimony on this primary issue of Ms. Crosswhite's concerns, motives and intent should be rejected, other than to make different, unsupported findings that Ms. Crosswhite engaged in an unrelenting 30- to 45-minute verbal assault on Jodi.

30

### *2. Substantial evidence does not support the finding of a 30-to 45-minute verbal assault*

In applying the Department's regulatory definition of "willful," the review judge found that Ms. Crosswhite did more than loudly and rudely demand to know what Jodi disclosed to her doctor before being asked to stop by Ms. Gonzalez. She found that Ms. Crosswhite continued to yell at Jodi for 30 to 45 minutes outside. She found that during this extended period of seeing Jodi cry, Ms. Crosswhite knew or should have known that she was inflicting injury or a negative outcome. *E.g.*, CP at 219-20 (CL 8) ("After yelling at Jodi in the waiting room, the Appellant continued to yell at her for 30 to 45 minutes in the parking lot."); CP at 220 (CL 10) (When Jodi started to cry, the Appellant should have known that she should stop . . . [S]he should not have continued to yell at her for another 30 to 45 minutes."); CP at 221 (CL 12) ("The Appellant could see that her yelling resulted in Jodi becoming upset, and did not stop her verbal assault."). If supported by the evidence, these findings could justify an inference that Ms. Crosswhite recognized at some point that she was inflicting injury.

But the only evidence that Ms. Crosswhite yelled at Jodi after leaving the doctor's office was the testimony of Debra Madill, the doctor's receptionist, that she had been able to see through the medical office window that Ms. Crosswhite continued to yell at Jodi for another half hour to 45 minutes.[9] This contention was raised for the first time at the

---

[9] Most of the evidence was that Jodi and Ms. Crosswhite were outside for 20

31

hearing, which took place almost six months after the August 1 doctor's appointment. Four months before that, in late September 2013, Ms. Madill had been asked to prepare a sworn declaration as to what she saw, in which she stated that Ms. Crosswhite yelled at Jodi in the waiting room but said nothing about seeing yelling continue outside. Ms. Madill's co-workers—the two employees who actually went out to check on Jodi and Ms. Crosswhite—did not witness Ms. Crosswhite yell at Jodi outside.

Most inexplicable about the review judge's finding that Ms. Crosswhite berated Jodi for as much as 45 minutes after leaving the office is that it is contradicted by Jodi's own statements when interviewed by Ms. Withrow. Ms. Withrow testified that when interviewed, Jodi told her that after Ms. Gonzalez told Ms. Crosswhite to "[s]top this," Ms. Crosswhite "quit." CP at 101. She then took Jodi outside.

Jodi's report, reproduced above, was that once outside, Ms. Crosswhite tried to calm her down, explaining that she cared about Jodi and was concerned about her health. Jodi reported that she continued to cry, which is not inconsistent with the conversation as Jodi describes it. She reported to Ms. Withrow that when medical staff came out to check on her she told them she was okay. The review judge's finding is also irreconcilable with Jodi's report to Ms. Munoz on the afternoon of the altercation that she and Ms.

---

minutes before being checked on by staff. *See* CP at 68 (case note of Susi Munoz report), 87 (testimony of Ms. Crosswhite), 101 (testimony of Ms. Withrow of what she was told by Jodi). Ms. Gonzalez stated when interviewed that she checked on Jodi after a "few minutes;" she testified at the hearing that it was 15 or 30 minutes. CP at 103, 120.

Crosswhite were going to try to work through the issue.

Viewed in light of "the whole record" as required by the APA, substantial evidence does not support the review judge's findings that Ms. Crosswhite's culpability can be inferred because she continued to yell at Jodi, despite Jodi's crying, for 30 to 45 minutes.

This case is akin to *Raven v. Department of Social & Health Services* in the respect that Ms. Crosswhite exercised poor judgment in acting on her concerns as she did. 177 Wn.2d at 834. ("[I]t is without question that Raven could have made better decisions in some areas and that she exercised poor judgment in meeting her mandates under professional standards in others. But the evidentiary record here cannot sustain a finding [of] . . . neglect" against Raven.). The record does not support the Department's finding that Ms. Crosswhite abused a vulnerable adult. We reverse the finding.

### III. Attorney fees

Ms. Crosswhite requests an award of costs and reasonable attorney fees on appeal under the "Equal Access to Justice Act" (EAJA), RCW 4.84.340-.360. Under RAP 18.1(a), a party may recover attorney fees on appeal if authorized by applicable law. Under the EAJA, "a court shall award a qualified party that prevails in a judicial review of an agency action fees and other expenses, including reasonable attorneys' fees, unless the court finds that the agency action was substantially justified or that circumstances make an award unjust." RCW 4.84.350(1). No challenge is raised to Ms. Crosswhite's

33

status as a qualified party. But the Department argues that in the event Ms. Crosswhite prevails, we should hold that its actions were nonetheless substantially justified because it investigated Ms. Crosswhite only after receiving a complaint; it was statutorily required to investigate; it has a duty to put the interests of vulnerable adults above the interests of caregivers; and it relied on language in Washington cases that was supportive of its position. Br. of Resp't at 37-38 (citing *Goldsmith*, 169 Wn. App. at 577-78, 585). It was also following a duly-adopted rule interpreting a statute that it enforces and interprets. *Id.* at 36.

We agree with the Department that in these circumstances, it should not be chilled from investigating incidents in the future out of fear that we will find its actions to be erroneous and award attorney fees. We find substantial justification and deny the request for an award of attorney fees.

_Siddoway, J._
Siddoway, J.

I CONCUR:

_Fearing, J._
Fearing, C.J.

34

33718-9-III

KORSMO, J. (dissenting) — While I had believed that public shaming largely had disappeared with the end of Puritan government in New England, the majority appears to give it new life whenever a boundary-challenged busybody claims to be acting in the victim's best interests. Since abusers in many different relationships frequently claim their abuse was intended to help the victim, I think the majority goes too far, ruining an otherwise fine opinion that provides some clarity and guidance to a problem area in need of both. However, the administrative triers of fact should be the ones who apply that new standard to the facts of this case, rather than a reviewing court a couple steps removed from the fact finding process. Therefore, I would remand for a hearing under the new standard and not address the sufficiency claim. Nonetheless, I also believe that the evidence would support a finding of abuse. For both reasons, I respectfully dissent.

Typically when an administrative hearing is conducted under the wrong process or the wrong evidentiary standard, we reverse for a new consideration of the appropriate standard. *Jenkins v. DSHS*, 160 Wn.2d 287, 302-03, 157 P.3d 388 (2007) (WAC invalidated; remand for hearing); *Arishi v. Wash. State Univ.*, No. 33306-0-III (Wash. Ct. App. Dec. 1, 2016), http://www.courts.wa.gov/opinions/pdf/333060_pub.pdf (hybrid administrative process authorized by a WAC invalidated; case remanded for full statutory

hearing). The same rule applies for a bench trial. *E.g., Wold v. Wold*, 7 Wn. App. 872, 877, 503 P.2d 118 (1972) (inadequate CR 52 findings require remand to trial court for either (1) new argument, (2) new findings, or (3) new trial). We should also remand this case. The analysis from both triers of fact unsurprisingly tracked the elements of the case as defined in the now-defunct WAC provision. They should be given the opportunity to find the facts under our new standard, just as the Department of Social and Health Services and Ms. Crosswhite should be given the opportunity to argue this case under that standard.

The majority avoids the necessity of remand by ruling that the evidence was insufficient to support the finding of abuse under the new standard. This misses the point. The purpose of evidentiary sufficiency review is to ensure that enough evidence was presented to meet the required burden of proof and avoid sending an insufficient case to the trier of fact. *Jackson v. Virginia*, 443 U.S. 307, 316-19, 99 S. Ct. 2781, 61 L. Ed. 2d 560 (1979). Deference is accorded the factfinder's view of the evidence. *Id.* at 319.[1]

---

[1] The majority's foray into appellate court fact finding is totally at odds with sufficiency review because it engages an appellate court in a fact finding function rather than a review function. Here, the Washington Administrative Procedures Act, ch. 34.05 RCW, recognizes only two factfinders—the ALJ and the review judge. It does not recognize this, or any other appellate court, as an additional factfinder. We must defer to the review judge's view of the evidence rather than reweigh the evidence with the ALJ's view of the evidence in mind. If the review judge served an appellate function rather than as a factfinder, perhaps this exercise could be justified. However, since the review judge is a second factfinder, the majority's approach mistakenly focuses on the ALJ's findings rather than those of the review judge.

Thus, evidentiary sufficiency review measures the case as it actually was tried with a bias in favor of the factfinder's construction of the evidence. We have no basis for considering whether the evidence meets the appropriate standard when no one has attempted to prove a case in accordance with that standard.

But even if we are to undertake that analysis here, the evidence still supports the finding of abuse. As the majority notes at page 9, RCW 74.34.020(2) in relevant part defines "abuse" as a "willful action" "that inflicts injury" "on a vulnerable adult." The majority recasts the statute, however, to convert a "willful action" into the purposeful infliction of injury. The primary problem with this approach is that the legislature expressly limited the willfulness component to the action (*i.e.*, it was not a negligent act) rather than to the outcome of the action. The majority justifies its approach by relying on a criminal nonsupport prosecution, *State v. Bauer*, 92 Wn.2d 162, 595 P.2d 544 (1979). *Bauer* cuts both ways in this circumstance. Properly construed, it better supports my view of the statute.

The criminal nonsupport statute punished anyone who, "[w]ilfully omits, without lawful excuse, to furnish necessary food . . . for his or her child." Former RCW 26.20.030(1)(b) (1973). *Bauer* noted that most commonly, "wilful" was used "to denote an act which is voluntary or knowing." 92 Wn.2d at 167. "The key to judicial construction of the term, however, lies in its legislative context." *Id.* Since the statute already contained an "element of lack of lawful excuse," the court did not need to

3

"construe" a mental element into the meaning of "wilful." *Id.* at 167-68. The court

noted:

> The focus of the statute is on the lack of a lawful excuse. Any malice on
> the part of the parent is irrelevant. The intent of the legislature thus appears
> to be to punish those parents who knowingly fail to support their children
> where they have no lawful excuse, such as economic inability, for doing so.
> The focus is not on the parent's malicious state of mind, but rather on their
> knowing conduct and lack of excuse.

*Id.* at 168. *Bauer*, as the majority properly does, then found this approach consistent with

the definition of "wilful" under the then-new criminal code. Turning to that definition,

the court noted that "wilful" was satisfied "if a person acts knowingly with respect to the

material elements of the offense." *Id.* It then applied the willfulness definition to the

elements of the nonsupport statute such as food, clothing, shelter, medical needs, and

financial support. *Id.*

The approach *Bauer* took to construing the nonsupport statute was entirely correct.

The willfulness element of that former statute applied to the parent's omissions—what

did the parent fail to provide that should have been provided? The legislature laid out the

omissions it was concerned with and the mental state was properly focused on them.

Here, however, the legislature has set forth a different element to which willfulness

applies—the *action* in question that leads to one of the four prohibited results.[2] Unlike

---

[2] Grammatically, the word "willful" is used as an adjective in the abuse definition
statute and modifies the word "action." In the former nonsupport statute, "wilfully" was

4

the failure to act at issue in the nonsupport statute, the legislature has not applied willfulness to the outcome of the willful abuse. If that body had desired that abuse would exist only when the actor intended the outcome, as well as the action, it could easily have said so. It did not. Instead, the only part of the statute that needs to be willful is the action that brings about the prohibited outcome.

The regulation, as construed by the review judge, correctly set forth the legislative intent requiring a willful action as the cause of the victim's harm. WAC 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 also added a foreseeability requirement that the perpetrator "knew or reasonably should have known," that the willful action would cause harm. This reading of the legislation is consistent with the longstanding interpretation of "willful" as including knowledge about the result of the action. However, knowledge of the reasonable outcome of the action is different than intending that outcome. That difference is the primary reason I disagree with the majority's construction of the statute.

Thus, Ms. Crosswhite's good intentions are not relevant to the inquiry here, any more than they are in any other abuse case.[3] Ms. Crosswhite agreed that she screamed at Jodi in the doctor's office. A reasonable person should understand that angrily lecturing

---

used as an adverb modifying the transitive verb "omits." Understandably, the modifier then also had to apply to the objects of that transitive verb (food, shelter, etc.).

[3] In a more perfect legislative scheme, the good intentions would be mitigating evidence to be considered when deciding how, if at all, to sanction Ms. Crosswhite for her misbehavior. The current draconian approach costs an "abuser" her career for one mistake without consideration of the circumstances.

5

an adult in public, particularly in sharing knowledge of the victim's intimate secrets with others, would cause injury. Ms. Crosswhite intentionally, purposefully, and willfully attempted to embarrass Jodi into changing her behavior. The review judge could properly conclude that this behavior was abusive. The evidence supports that determination.

Ms. Crosswhite was hired as a caregiver to provide services to Jodi such as transportation, food preparation, and housework. She was not hired as a doctor, a personal nurse, or a scold. When Ms. Crosswhite stepped outside her official duties, she was on very thin ice. When she then performed that self-assumed function in a completely unprofessional manner, she hurt the person she was supposed to be helping. Instead of acknowledging her mistake, she has attempted to defend on the basis that she took her action in the best interests of her victim. While our statutes ought to take motivation into account when assessing sanctions, they currently do not. But that omission does not therefore require us to read good motives into the statute as a defense to an allegation of abuse any more than we would in an assault, homicide, or harassment case. The attacker does not get to define what is in the best interests of the victim, let alone defend on that basis.[4]

---

[4] This recalls to mind the Vietnam era justification for atrocities committed against the citizens of South Vietnam: "It became necessary to destroy the town to save it." *Major Describes Move*, N.Y. TIMES, Feb. 8, 1968, at 14.

6

No. 33718-9-III
*Crosswhite v. DSHS*

We should either be remanding this case for further proceedings under a correct interpretation of the statute, or we should be affirming. Because the majority reverses, I respectfully dissent.

_____<br>Korsmo, J.