IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | | |
|---|---|---|
| PATRICK KIHURIA, | ) | No. 80938-5-I |
| | ) | |
| Appellant, | ) | DIVISION ONE |
| | ) | |
| v. | ) | UNPUBLISHED OPINION |
| | ) | |
| STATE OF WASHINGTON, | ) | |
| DEPARTMENT OF SOCIAL & | ) | |
| HEALTH SERVICES, | ) | |
| | ) | |
| Respondent. | ) | |
| | ) | |

HAZELRIGG, J. — Patrick Kihuria seeks reversal of the Final Order issued by the Department of Social and Health Services Board of Appeals (BOA) upholding two substantiated findings that he neglected a vulnerable adult. He objects to the BOA's consideration of certain evidence, challenges its findings of fact and conclusions of law, and argues that the revocation of his adult family home license should have been reviewed. We affirm.

FACTS

In the summer of 2015, Patrick Kihuria owned and operated Safe Haven Adult Family Home in Bonney Lake. Kihuria provided personal care, housing, and meals for the home's residents. He employed one other caregiver. At that time, Safe Haven had at least four residents: Arthur, Guy, James, and Thomas.

Arthur was approximately 82 years old. According to an assessment conducted on August 10, 2015, he was "[e]asily confused" and had problems with both "recent and long-term memory." Although the report did not indicate a diagnosis of Alzheimer's disease or dementia, it noted a program of "Alzheimer's/dementia special care" to be provided by facility staff as needed. The assessment stated that Arthur needed to be within caregiver eyesight at all times. Arthur had lost his balance and fallen within the previous six months and used a walker to maintain his balance. Other listed limitations included "[p]oor decisions/unaware of consequences," "[g]ets lost outside of residence," "[p]oor safety awareness," and "[u]nsafe in traffic."

Thomas was approximately 72 in the summer of 2015. His most recent assessment was conducted on March 26, 2015, before he moved to Safe Haven. He was diagnosed with Alzheimer's disease and had problems with recent memory. Thomas had a history of aggressive behavior, was easily agitated, and exhibited exit-seeking behavior. He also used a walker and had fallen within the previous month. The report indicated that Thomas had "poor safety awareness" and instructed his caregiver to "[k]eep client within sight" when outside of his immediate living environment.

On August 12, 2015, James had a medical appointment at 3:40 p.m. at a clinic in Puyallup. Kihuria had made arrangements for James' daughter, who is his Power of Attorney (POA) and Medical Power of Attorney, to meet them at the facility. Kihuria took Arthur, Guy, James, and Thomas to the appointment. When taking four residents out at once, Kihuria would normally take two cars, with

another caregiver driving some of the residents in the second car. On this occasion, all four residents drove with Kihuria in his car and a second caregiver did not accompany them because Kihuria believed that James' POA would be at the facility to help. When they arrived, Kihuria asked Arthur, Guy, and Thomas if they wanted to go into the clinic or stay in the car. Arthur and Guy elected to stay in the car, while Thomas accompanied Kihuria and James into the clinic. Kihuria left the doors and windows of the car open.

The front of the clinic, which faces the parking lot, is covered in floor to ceiling glass on both the first and second floors. The building has at least three motion-activated security cameras: one facing the parking lot, one mounted outside the building facing the exterior door, and one facing the check-in desk that captures images of patients approaching the desk and staff working behind the counter.

Kihuria checked James in for his appointment, then left James and Thomas sitting in the waiting room and went back to the car to check on Arthur and Guy. He returned to the clinic but kept checking the car through the clinic windows. At the time of James' appointment, his POA had not arrived. Kihuria took James and Thomas to the examination room on the second floor. The medical assistant told Kihuria that Thomas could not stay in the room because of HIPAA[1] privacy requirements. Thomas moved to the second floor waiting area, which overlooks the parking lot. Kihuria needed to accompany James during his appointment to obtain the medical information needed to care for him. Throughout the

---

[1] Health Insurance Portability and Accountability Act of 1996.

appointment, Kihuria moved between the examination room and the second floor waiting area, where he checked on Thomas and on Arthur and Guy through the windows.

The events that occurred during James' appointment were partially documented by the video cameras and witness testimony. Thomas left the second floor waiting area and walked downstairs into the parking lot. The cameras show Arthur entering the clinic and approaching the check-in area. Patricia Wigington, the clinic manager, testified that Arthur told staff at the check-in desk that the police had asked him to stay in the parking lot about an hour before. The staff contacted Wigington, who walked with Arthur to the parking lot. As they were walking, Arthur told Wigington that there was a baby in the car. Wigington believed that Arthur was confused, but she decided to look into the situation. She observed Thomas wandering in the parking lot and "looking lost." When she got to the car, she saw Guy sitting in the back seat. She stated that both Guy and Arthur were "diaphoretic, meaning drenched in sweat." Wigington was able to glean that the men's caregiver was named Patrick and was in the clinic with a fourth individual. She asked around the clinic until she located Kihuria and informed him of the situation.

Wigington reported the incident to Adult Protective Services (APS). APS investigator Carmen Cabrera interviewed witnesses, reviewed camera footage, and received a written statement from Wigington. DSHS issued notices informing Kihuria that APS had determined that his actions concerning Arthur, Guy, and Thomas on August 12, 2015 met the definition of neglect in RCW 74.34.020, as

did his conduct in a separate incident involving Thomas on August 28, 2015. Kihuria requested administrative hearings to contest each of the findings.

After three days of hearings, the Administrative Law Judge (ALJ) issued an Initial Order reversing all four findings of neglect. DSHS requested that the DSHS Board of Appeals (BOA) review the Initial Order. On February 25, 2019, the BOA issued a Review Decision and Final Order modifying the ALJ's Initial Order. The BOA disagreed with the ALJ in part, affirming DSHS's original findings that Kihuria had neglected Arthur and Thomas on August 12, 2015 and neglected Thomas on August 28, 2015. However, the BOA agreed with the ALJ that the finding of neglect regarding Guy should be reversed.

Kihuria then filed a petition for judicial review with the superior court, arguing a number of errors by the BOA. First, he contended that the Review Judge improperly considered Wigington's affidavit and portions of her testimony that had not been "accepted as evidence" by the ALJ. He also argued that the "preponderance of [the] evidence" standard applied by the BOA was improper because the revocation of his license constituted an appropriation of property. Next, he contended that the BOA "failed to carefully scrutinize the evidence."

The court denied the petition for review as to DSHS's determination that he neglected Arthur and Thomas on August 12, 2015 and affirmed the final order as to those determinations. However, the court granted review of the determination that he neglected Thomas on August 28, 2015 and reversed that portion of the final order.[2] Kihuria moved for reconsideration, which was denied. He appealed.

_____

[2] The Department has not appealed the Superior Court's ruling regarding the August 28, 2015 incident involving Thomas.

ANALYSIS

The Washington Administrative Procedure Act (WAPA)[3] governs judicial review of a final agency action.  RCW 34.05.510; Conway v. Wash. State Dep't of Soc. & Health Servs., 131 Wn. App. 406, 414, 120 P.3d 130 (2005).  The superior court acts in its limited appellate capacity when reviewing an administrative decision.  City of Seattle v. Pub. Emp't Relations Comm'n, 116 Wn.2d 923, 926, 809 P.2d 1377 (1991).  We sit in the same position as the superior court on appeal, "applying the standards of the WAPA directly to the record before the agency." Tapper v. State Emp't Sec. Dep't, 122 Wn.2d 397, 402, 858 P.2d 494 (1993).  Accordingly, we review the administrative record rather than the superior court's findings and conclusions.  Crosswhite v. Wash. State Dep't of Soc. & Health Servs., 197 Wn. App. 539, 548, 389 P.3d 731 (2017).

The appellate court reviews the final order of the review judge, not the initial order entered by the ALJ.  Id.

> Where the ALJ and the review officer enter contradictory findings, we do not accord the deference to the ALJ that we would accord to the trier of fact in a nonadministrative matter, because the review officer has broad decision-making authority and is intended to bring the agency's expertise to bear.

Id.  However, if the review judge fails to give due regard to findings that were informed by the ALJ's ability to observe the witnesses, this may constitute an error of law.  Id.

We review findings of fact from the agency's final order for substantial evidence, and we will uphold findings "supported by a sufficient quantity of

---

[3] Chap. 34.05 RCW.

evidence to persuade a fair-minded person of the order's truth or correctness." Id.

We accept "the fact-finder's views regarding the credibility of witness and the

weight to be given reasonable but competing inferences." State ex rel. Lige & Wm.

B. Dickson Co. v. County of Pierce, 65 Wn. App. 614, 618, 829 P.2d 217 (1992).

Unchallenged findings of fact are treated as true statements on appeal. See

Tapper, 122 Wn.2d at 407.

Courts are permitted to grant relief from an agency order under certain

circumstances enumerated in statute:

> (a) The order, or the statute or rule on which the order is based, is in violation of constitutional provisions on its face or as applied;
> (b) The order is outside the statutory authority or jurisdiction of the agency conferred by any provision of law;
> (c) The agency has engaged in unlawful procedure or decision-making process, or has failed to follow a prescribed procedure;
> (d) The agency has erroneously interpreted or applied the law;
> (e) The order is not supported by evidence that is substantial when viewed in light of the whole record before the court, which includes the agency record for judicial review, supplemented by any additional evidence received by the court under this chapter;
> (f) The agency has not decided all issues requiring resolution by the agency;
> (g) A motion for disqualification under RCW 34.05.425 or 34.12.050 was made and was improperly denied or, if no motion was made, facts are shown to support the grant of such a motion that were not known and were not reasonably discoverable by the challenging party at the appropriate time for making such a motion;
> (h) The order is inconsistent with a rule of the agency unless the agency explains the inconsistency by stating facts and reasons to demonstrate a rational basis for inconsistency; or
> (i) The order is arbitrary or capricious.

RCW 34.05.570(3). The burden of demonstrating that an agency action is invalid

rests with the party asserting invalidity—here, Kihuria. RCW 34.05.570(1)(a).

The bases for Kihuria's arguments are not abundantly clear. First, he appears to object to the consideration of the video tape and of Wigington's testimony. He also challenges the findings of fact and conclusions of law, although he does not assign error to any specific findings. Finally, he contends that the superior court should have considered the fact that the BOA revoked his adult family home (AFH) license shortly before issuing its final ruling.

I.      Evidentiary Challenges

        A. Video Footage

Kihuria argues that the BOA should have refused to consider the Department's video evidence because he was never provided with an unedited version of the video. He cites no authority in support of his argument but contends that the footage is unreliable because it contains "jumps" and was edited to blur the faces of individuals who were not involved.

In an administrative proceeding, an ALJ may admit evidence "based upon the reasonable person standard," meaning "evidence that a reasonable person would rely on in making a decision." WAC 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(2); see also RCW 34.05.452(1). The finder of fact then determines the weight to be given to the evidence. WAC 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(6)(b); see also RCW 34.05.464(4).

The jumps in the video footage were explained by testimony at the hearing that the cameras were motion-activated and only saved footage when they detected movement. There was also testimony that the videos were redacted to obscure the identities of individuals who were not relevant to this case to protect their privacy. The chronology of the videos was not modified in any way.

Video evidence is evidence that a reasonable person would rely on in determining the way in which a sequence of events unfolded. Kihuria's objections go to the weight to be given the evidence rather than its admissibility in an administrative proceeding. The finder of fact was entitled to determine the weight of this evidence.

B. Wigington Testimony

Kihuria also argues that Wigington's testimony should have been rejected in its entirety because part of her testimony was stricken. Again, he cites no authority for this argument.

During Wigington's testimony, she stated that she was referring to notes that she had made before preparing the statement that she submitted to the APS investigator. Kihuria objected that he had not seen the notes, and Wigington indicated that she could not release the notes "for HIPAA reasons." The ALJ then ruled that "all the testimony that has to do with the time, the check in, when they went upstairs, the point in time, all that stuff" was stricken. DSHS pointed out that some of that information was in her written statement and proceeded with questioning.

All of the references to specific times in the Final Order appear to be based on the time stamps of the video. Kihuria has not shown that the BOA considered the portion of Wigington's testimony that was stricken.

II.     Findings of Fact and Conclusions of Law

Kihuria challenges the BOA's order concluding that Kihuria neglected Thomas and Arthur in violation of RCW 74.34.020(15)(b).  Although he does not assign error to specific findings of fact, we interpret his arguments as challenges to the findings regarding the clinic's location in relation to arterial roads, the weather on the date of the incident, the video footage, and Wigington's testimony.  As noted above, it was not error to admit the video footage and Wigington's remaining testimony.  Substantial evidence in the record supports the findings recounting the video recordings and the portions of Wigington's testimony that were not stricken.

Kihuria argues that BOA erred in finding that there was no evidence describing the relationship between the surrounding roadways and the clinic parking lot.  The BOA found that the clinic "is near two (2), four (4) lane arterials.  There is nothing in the record that shows where the arterials are in relation to the parking lot and the clinic entrance."  Kihuria contends this finding should be disregarded because he offered a satellite photograph of the clinic campus depicting the parking lots with a two-lane access road and a single four-lane arterial at the south edge of the campus.  He further claims the photos showed "there was no body of water, no freeway—the area was surrounded by a greenbelt, not a wooded area."  The photographs of the clinic parking lot in the record do not clearly show the location of the nearby roads but do show trees surrounding the parking lot.  A satellite image of the area also appears to show trees surrounding the parking lot.  This finding is supported by substantial evidence.

Kihuria also disputes the BOA's finding that the temperature was "in the high 80's" when Arthur came into the lobby of the clinic. He cites a weather report in the record, saying it "showed it was in the mid '70s." For August 12, 2015, in Puyallup, the report he cites lists a temperature range of 75 to 86 degrees at 12:00 p.m. and a temperature range of 64 to 84 degrees at 6:00 p.m. Wigington's written statement to the APS investigator noted that it was "approximately 87 degrees" on the afternoon of August 12, 2015. Substantial evidence supports the BOA's finding of fact on this point.

Kihuria contends that it was error to conclude that he had neglected Thomas and Arthur based on these findings of fact. One definition of neglect in the statute is "an act or omission by a person or entity with a duty of care that demonstrates a serious disregard of consequences of such a magnitude as to constitute a clear and present danger to the vulnerable adult's health, welfare, or safety." RCW 74.34.020(16)(b). We give substantial weight to the agency's interpretation of the statute it administers on review. King County v. Cent. Puget Sound Growth Mgmt. Hr'gs. Bd., 142 Wn.2d 543, 553, 14 P.3d 133 (2000).

The findings of fact support the conclusion that Kihuria neglected Thomas and Arthur. Kihuria left Arthur in the car without a caregiver while he went into the clinic despite the directive in Arthur's recent care assessment that he remain within caregiver eyesight at all times. Although Kihuria could see him through the windows of the waiting room, he could not keep Arthur within sight while he was in the examination room with James. Kihuria also left Thomas unsupervised while he was in the examination room despite knowing that Thomas had Alzheimer's

and frequently exhibited exit-seeking behavior. The clear and present danger to their health, welfare, or safety was evident from the assessments showing that the vulnerable adults could be dangerous to themselves when unsupervised as well as their location in a public parking lot near arterial streets.

The record does not support Kihuria's argument that the BOA interpreted the statute defining neglect to require "constant monitoring" of a vulnerable adult. The Final Order makes clear that Kihuria's failure to monitor Arthur and Thomas constituted neglect in light of the vulnerable adults' needs. The BOA did not err in concluding that Kihuria neglected Arthur and Thomas.

III.    Adult Family Home License

Kihuria asserts that it was "error for the Superior Court to refuse to consider the unlawful revocation of the Appellant's Adult Family Home license issued by the DSHS[ ]Board on February 20, 2019, five days before the Final Order was issued on the claims brought against the Appellant in this matter[.]" As noted above, we typically do not consider the superior court's conclusions in an administrative appeal. But Kihuria contended in his brief to the superior court that the court should address this new issue under RCW 34.05.554(1) because DSHS "revoked the Appellant's license without 'Notice' on February 20, 2019 before the Final Findings were released on February 25, 2019" and "recorded Mr. Kihuria's name in the Background Registry System (BRS) on March 12, 2019 effective February 25, 2019." He argued that DSHS revoked his AFH license "secretly on February 20,[ ]2019 while the review was in process and no notice was provided."

Kihuria submitted as an exhibit to that brief a letter from DSHS dated June 6, 2019 informing him of the revocation of his AFH license "effective immediately on June 6, 2019." The letter also informed him of his appeal rights and the time frame during which he could exercise those rights. Kihuria cites to the Statement of Deficiencies report enclosed with the letter that included a finding that "[a] review of a department document dated 04/18/19, said the Provider's credential to practice in any health care profession was suspended based on a substantiated finding of neglect of a vulnerable adult occurring in December 2015." The Statement of Deficiencies also included the following finding:

> During a telephone interview on 05/22/19 at 10:15 AM, Collateral Contact #1 (Legal Benefits Advisor for [ ] the department) said the Provider was notified verbally on 02/25/19, that a final decision had been made to revoke the Provider's credential as of 02/20/19. The Provider was informed he had ten (10) days to appeal[ ] but did not appeal. After the ten day period, the finding of neglect was made final, and the Provider was placed on the department's long-term care neglect registry.

The document made three other references to this earlier date in the form of notes that residents' case managers did not know that Kihuria's "credential [was] suspended on 02/20/19." Kihuria also submitted an ex parte order dated April 18, 2019 suspending his credential to practice as a certified nursing assistant pending further disciplinary proceedings of the Department of Health. This suspension resulted in Kihuria being "prohibited from being employed in the care of and having unsupervised access to vulnerable adults."

Even assuming the February 20, 2019 date was not a typographical error, the record does not support Kihuria's assertion that his AFH license was secretly revoked before the Final Order was issued. The only references to this date states

that Kihuria's "credential" was suspended and he therefore was "prohibited from caring for[ ] or having unsupervised access to residents." The investigator who wrote the report concluded that the AFH failed to ensure that Kihuria was not providing care to residents while he was prohibited from doing so. This language suggests that the investigator was referring to Kihuria's certified nursing assistant credential rather than his AFH license. Kihuria's contention that the Final Order was invalid because it did not include the AFH license revocation, an event that had not taken place at the time the Final Order was entered, is without merit.

Affirmed.[4]

WE CONCUR:

---

[4] In the last sentence of his reply brief, Kihuria states, "The Appellant is requesting for all lawyer fees and sanctions on DSHS and counsels that pursued to violate the Appellant constitutional rights [sic]." This appears to be a request for an award of attorney fees on appeal or sanctions against DSHS. If so, it is denied. Kihuria identifies no basis for such an award and does not comply with any of the requirements of RAP 18.1(b).