**FILED**
**NOVEMBER 26, 2024**
In the Office of the Clerk of Court
WA State Court of Appeals, Division III

IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| JESSICA KIRKWOOD, | ) | |
| | ) | No.  39529-4-III |
| Appellant, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| WASHINGTON STATE DEPARTMENT | ) | UNPUBLISHED OPINION |
| OF CHILDREN, YOUTH AND | ) | |
| FAMILIES, | ) | |
| | ) | |
| Respondent. | | |

COONEY, J. — Child Protective Services (CPS) commenced an investigation of

Jessica Kirkwood after it was discovered Ms. Kirkwood was dating a registered sex

offender, William Salamone, and allowing unsupervised contact between Mr. Salamone

and Ms. Kirkwood's young daughter, Delores.[1]  At the time, Ms. Kirkwood and Delores

---

[1]      To protect the privacy interests of the child, we use a pseudonym throughout this opinion.  Gen. Order of Division III, *In re the Use of Initials or Pseudonyms for Child Victims or Child Witnesses*, (Wash. Ct. App. June 18, 2012),  https://www.courts.wa.gov/ appellate_trial_courts/?fa=atc.genorders_orddisp&ordnumber=2012_001&div=III

were already involved in a pending CPS investigation into whether Dr. Kenneth

Kirkwood, Delores's biological father, was sexually abusing Delores. Ultimately, the

Department of Children, Youth, and Families (Department) determined the allegations of

negligent treatment or maltreatment against Ms. Kirkwood were founded. Ms. Kirkwood

requested an internal agency review of the Department's finding. The Department

upheld the finding. Ms. Kirkwood then requested a hearing before the Office of

Administrative Hearings (OAH). OAH affirmed the founded finding in an initial order.

Ms. Kirkwood then appealed to the Board of Appeals (Board), which also affirmed the

finding. Ms. Kirkwood petitioned for judicial review in superior court, which certified

the case to this court for direct review.

On appeal, Ms. Kirkwood argues: (1) the Board's decision is not supported by

substantial evidence, (2) the Board erroneously applied or interpreted the law, (3) the

Board's decision was arbitrary and capricious, and (4) the Board mischaracterized the

testimony of Ms. Kirkwood and Mr. Salamone and erroneously rejected hearsay

previously accepted by the administrative law judge. We disagree with each of Ms.

Kirkwood's arguments and affirm.

## BACKGROUND

Ms. Kirkwood and Dr. Kirkwood are the parents of Delores. Delores was between

four to six years old at the time of the events at issue in this case. Following a

contentious divorce, Ms. Kirkwood and Dr. Kirkwood's custody of Delores varied. In

2

2016, Ms. Kirkwood met, and later began dating, William Salamone, who is a registered

sex offender. At the time relevant to this appeal, Delores lived with Ms. Kirkwood.

Prior to early October 2017, CPS received a referral from Ms. Kirkwood alleging

that Delores had disclosed sexual abuse by Dr. Kirkwood. On October 11, 2017, CPS

received a referral alleging that Ms. Kirkwood negligently treated or maltreated Delores

based on Delores's disclosure that Ms. Kirkwood allowed Mr. Salamone to "babysit[ ]

[Delores]" and that he "was bringing [Delores] to school on a daily basis."

Administrative Record (AR) at 4. Following its investigation, the Department mailed a

letter to Ms. Kirkwood explaining its founded finding of negligent treatment or

maltreatment. In the letter, the Department explained that:

> The assigned investigator contacted your daughter's school, and they
> confirmed [Mr. Salamone] was bringing [Delores] to school most of the
> time. Later on during our Family Team Decision Meeting you confirmed
> that [Mr. Salamone] was sleeping in your home four out of five weeknights
> per week. This is your third interaction with the department, and the
> concerns around this man have been addressed with you in the past. You
> stated that you had signed a copy of RCW 9A.42.110, which states that
> it is a crime to leave a child alone with someone who is a registered sex
> offender. On top of all this, you stated that you have read and fully
> understand what [Mr. Salamone] was charged with. This is concerning
> because his convictions are very similar to the allegations your daughter is
> currently making. Knowing all of this, you chose to let this man have
> unsupervised contact with your daughter by letting him sleep in your home
> and giving them alone time in the car together almost daily on [Delores's]
> way to school.

AR at 4.

Ms. Kirkwood asked the Department to "conduct an internal agency review of the founded finding." AR at 4. The Department later notified Ms. Kirkwood that no changes would be made to the founded finding. Ms. Kirkwood requested a hearing with the OAH.

The OAH held a hearing that spanned three days. Numerous witnesses testified at the hearing. The relevant testimony is summarized below.

Jennifer Knight was Delores's therapist. Ms. Knight testified that Delores began therapy with her in early September 2017. Delores reported to Ms. Knight that Mr. Salamone "comes over a lot and . . . took her to school." 1 Rep. of Proc. (RP) (Nov. 21, 2018) at 33. Upon discovering Mr. Salamone was a registered sex offender, Ms. Knight reported Delores's disclosure to Jarel Sanders, the CPS investigator assigned to Delores's case. Ms. Knight testified that she was concerned about Delores being around Mr. Salamone because she was "a vulnerable young girl" who "was already disclosing sexual abuse." 1 RP (Nov. 21, 2018) at 45. When asked if Ms. Knight would "have any concerns" about Delores being driven to school by a registered sex offender, she answered "yes." 1 RP (Nov. 21, 2018) at 46-47.

Mr. Sanders testified that he was the CPS investigator who investigated the allegations that Dr. Kirkwood was sexually abusing Delores, as well as the allegations that Ms. Kirkwood was leaving Delores alone with Mr. Salamone. When Mr. Sanders discovered that Ms. Kirkwood was dating a registered sex offender, he had her sign a

document explaining that there is a law prohibiting a parent from leaving their child alone with a sex offender. Mr. Sanders stated that he discovered Ms. Kirkwood had actually already signed this document, revealing her awareness of the law.

Mr. Sanders testified that he learned at a family team decision meeting with Ms. Kirkwood and Dr. Kirkwood, among others, that Mr. Salamone was staying at Ms. Kirkwood's home "three or four nights a week." 1 RP (Nov. 21, 2018) at 124. Mr. Sanders testified that after speaking with Delores and the principal of Delores's school, he confirmed Mr. Salamone "was the person that had been dropping [Delores] off at school." 1 RP (Nov. 21, 2018) at 129. Mr. Sanders later learned that Mr. Salamone's prior convictions were for "child sex abuse." 1 RP (Nov. 21, 2018) at 133. He testified that Mr. Salamone's prior convictions were for "rape of a child in the third degree," "child molestation," and "indecent liberties." 1 RP (Nov. 21, 2018) at 222. Mr. Sanders also found out from Ms. Kirkwood that she remained on the phone with Mr. Salamone while he took Delores to and from school. Mr. Sanders discussed "with [Ms. Kirkwood] . . . if something were to happen, how would you make sure that [Delores] stayed safe if you were on the phone and not there in person." 1 RP (Nov. 21, 2018) at 133.

When Mr. Sanders spoke to Ms. Kirkwood about Mr. Salamone's prior offenses, Ms. Kirkwood said:

> So, um, when we spoke about his, um, convictions—about his—him—
> Mr. Salamone being a sex offender, um, she said that she had, um, read
> over what his charges were and had read through the paperwork, um, and
> she had spoken with his family, um, to mitigate her own concerns about her

5

> daughter being at risk. Um, and—and that was her basis for, um, you know, letting [Mr. Salamone], um, sleep in the house and to drive her to school.

1 RP (Nov. 21, 2018) at 135. Mr. Sanders also testified that Ms. Kirkwood's presence on the phone while Mr. Salamone took Delores to school did not mitigate the concerns about the situation because Ms. Kirkwood could not protect Delores if something happened. There was "nothing stopping [Mr. Salamone] from hanging up the phone and then offending on [Delores]." 1 RP (Nov. 21, 2018) at 135. He also stated that Mr. Salamone sleeping over at Ms. Kirkwood's home with Delores present "would be unsupervised contact because . . . [Ms. Kirkwood] doesn't know what's happening when she's unconscious." 1 RP (Nov. 21, 2018) at 136.

When asked what his understanding of negligent treatment or maltreatment was, Mr. Sanders testified that "there's a very elongated definition" and the part that applied to Delores's case was:

> I believe it's towards the end of what the State describes as neglect or maltreatment, and that's, um, doing anything that could—that puts your child at risk, um, for, um, you know—of harm, and that the child doesn't actually have to be, um, uh—the act doesn't actually have to happen, it's just the risk of it happening.

1 RP (Nov. 21, 2018) at 137.

During her testimony, Ms. Kirkwood claimed Delores disclosed to her that Dr. Kirkwood was sexually abusing her in June 2017. Ms. Kirkwood stated she met Mr. Salamone in June 2016 and that their relationship became intimate in June 2017. She testified that she became aware of Mr. Salamone's prior sexual abuse convictions about a

6

month after she met him and that she introduced Mr. Salamone to Delores within three weeks of dating him.

Ms. Kirkwood testified that she was aware of: the statute prohibiting her from leaving Delores alone with Mr. Salamone; Mr. Salamone's prior convictions for sexual abuse; the fact that Mr. Salamone's victims were ages 8, 9, 11, and 14 when he offended them; and the fact that some of Mr. Salamone's victims were his stepchildren. Ms. Kirkwood testified she spoke to the stepchildren, and that she had read "the charges." 2 RP (Mar. 14, 2019) at 62. Ms. Kirkwood stated she "did not allow [Delores] to be alone with [Mr. Salamone]," and that she "watched [Mr. Salamone and Delores] like a hawk." 2 RP (Mar. 14, 2019) at 63.

Ms. Kirkwood also testified that she spoke to a detective at the "Sheriff's Office" about Mr. Salamone's "restrictions" and whether he was at a "high risk." 2 RP (Mar. 14, 2019) at 128. Ms. Kirkwood testified the detective said, "[Mr. Salamone] has not reoffended" and that he was at "the lowest level that they have." 2 RP (Mar. 14, 2019) at 128-29. She also testified the detective told her "once someone goes past the five-year mark, after each year their risk decreases from that point statistically." 2 RP (Mar. 14, 2019) at 129.

Ms. Kirkwood was questioned about a trip to Disney World she took with Delores and Mr. Salamone. She answered "no" when asked if they all slept in the same room

during the trip.  2 RP (Mar. 14, 2019) at 56.  However, Ms. Kirkwood changed her

testimony in response to further questioning:

> Q. Ms. Kirkwood, I asked you, um, uh—you indicated you had a
> hotel room at Disney World; is that right?
> A. Yes.
> Q. And I asked you, um, did you all stay in the same room; you,
> Mr. Salamone, and [Delores].
> A.· In the hotel room.
> *Q. Yes. So, you all stayed in the same room?*
> *A. Yes.*

2 RP (Mar. 14, 2019) at 60-61 (emphasis added).

Ms. Kirkwood also testified that Mr. Salamone drove Delores to kindergarten,

picked her up from school, and dropped her off at the home of Ms. Kirkwood's mother

and sister.  She testified Mr. Salamone did not watch Delores after school because she

"didn't want him watching her alone."  2 RP (Mar. 14, 2019) at 73.  Ms. Kirkwood was

then asked:

> Q. And yet you—and yet you made the decision given her
> allegations, you made the decision to have a man around her that had the
> same kinds of, um, uh, convictions—or the same kinds of concerns with his
> own children.
> A. Well, see, that's where I differ on that. What I understand is he
> performed oral sex on the 14-year old. Um, [Delores] is nowhere near a 14-
> year old. Um, [Delores] never disclosed anything regarding oral sex.

2 RP (Mar. 14, 2019) at 73.

Regarding whether Mr. Salamone spent the night at Ms. Kirkwood's home while

Delores was present, Ms. Kirkwood first testified that Delores was "at her grandmother's

house" when Mr. Salamone slept over.  2 RP (Mar. 14, 2019) at 153.  She testified that

8

from June 2017 to late September 2017, she did not "recall" any times that Mr. Salamone spent the night while Delores was also in the home.  2 RP (Mar. 14, 2019) at 154.  She then clarified that if Mr. Salamone did spend the night while Delores was there, "the precaution, I—I remember in my head was, the floor creaked in the kitchen and it was very loud."  2 RP (Mar. 14, 2019) at 155.  She also testified that her and Mr. Salamone slept in the basement, and Delores's room was on the third floor.

Ms. Kirkwood further testified that she read a Washington Administrative Code (WAC) provision that stated "children are, um, considered supervised if there is auditory or visual on them at all times."  2 RP (Mar. 14, 2019) at 76.  Ms. Kirkwood testified that she was on speaker phone with Mr. Salamone while he took Delores to and from school.

William Salamone testified that he was twice convicted of sexual offenses and was a level one registered sex offender.  On his first sexual offense, Mr. Salamone testified he was sentenced to three years of probation but reoffended and sentenced to prison for "roughly three and half years."  3 RP (Mar. 15, 2019) at 88-89, 91. Mr. Salamone testified his first convictions were in 1984 or 1985, and his second conviction was in 1989.  He testified that two of his victims were his stepchildren.

Mr. Salamone testified that he engaged in sexual offender treatment and that the treatment after he reoffended was "successful" and it helped him by making him "aware of what [he] did and its impact."  3 RP (Mar. 15, 2019) at 102.  He testified that he was abusing cocaine from 1984 to 1989 but that he had not used the drug since he went to

9

prison in 1989. He admitted to using marijuana "sometimes on weekends." 3 RP (Mar. 15, 2019) at 97.

Following the hearing, the OAH issued an initial order affirming the Department's founded finding against Ms. Kirkwood of negligent treatment or maltreatment. Ms. Kirkwood appealed the OAH's initial order to the Board. The Board "conducted a de novo (anew) review of the record" and ultimately affirmed the initial order. AR at 3.

The Board found Ms. Kirkwood's testimony about whether Mr. Salamone stayed the night at her home while Delores was present was conflicting. The Board noted Ms. Kirkwood testified "Mr. Salamone spent the night when [Delores] was there 'once or twice', and another time she testified it was a 'few times', and she also denied that it occurred at all." AR at 26. The Board agreed with the OAH and found "it more likely than not that Mr. Salamone spent occasional nights at [Ms. Kirkwood's] home when [Delores] was present in the home during the fall of 2017." AR at 26.

The Board found that Mr. Salamone "would come over four or five days per week in the morning to help [Ms. Kirkwood] get [Delores] ready for school" and that Mr. Salamone took Delores "to school 16 to 18 times" during the fall of 2017. AR at 19. The Board found "Mr. Salamone and [Ms. Kirkwood] would have their cell phones on the entire time Mr. Salamone was taking [Delores] to school" but it found Ms. Kirkwood's argument that this constituted adequate supervision "demonstrates a lack of sound judgment and ignores the plain language of RCW 9A.42.110." AR at 19, 31.

10

The Board also found that Ms. Kirkwood "provided multiple hearsay statements of the unnamed Thurston County Sheriff's office detective and the stepchildren of Mr. Salamone" and that the Department was unable to "contradict these statements as these individuals were not present for questioning." AR at 30. The Board therefore considered the statements "solely as elements of [Ms. Kirkwood's] thought process in determining the risk to [Delores]" and not as proof for the truth of the statements. AR at 30.

Finally, in its final order, the Board found "Mr. Salamone posed a clear and present danger to [Delores] because of his criminal history" and Ms. Kirkwood's "failure to appreciate the danger posed to [Delores] by Mr. Salamone showed a serious disregard of the consequences to the child of such magnitude that it created a clear and present danger to [Delores's] health, welfare, or safety." AR at 32. The Board concluded that Ms. Kirkwood "negligently treated or maltreated [Delores], under WAC 388-15-009(5), when she continued to allow unsupervised contact between [Delores] and Mr. Salamone after learning of Mr. Salamone's history as a sex offender and being advised of the statute prohibiting unsupervised contact." AR at 33.

Ms. Kirkwood petitioned the Thurston County Superior Court for judicial review of the Board's decision and final order. The superior court certified the matter to this court for direct review pursuant to RCW 34.05.518.

11

ANALYSIS

On appeal, Ms. Kirkwood argues: (1) the Board's decision is not supported by substantial evidence, (2) the Board erroneously applied or interpreted the law, (3) the Board's decision was arbitrary and capricious, and (4) the Board mischaracterized the testimony of Ms. Kirkwood and Mr. Salamone and erroneously rejected hearsay previously accepted by the administrative law judge. We address each contention in turn.

The Child Abuse and Neglect Act, chapter 26.44 RCW, authorizes the Department to investigate reports of child abuse or neglect. RCW 26.44.030. At the conclusion of an investigation, the Department determines whether the reports of child abuse or neglect is founded or unfounded. RCW 26.44.030(13)(a). "Founded" means that "it is more likely than not" that the child abuse or neglect occurred. RCW 26.44.020(14). Relevant here is RCW 26.44.020(19), which addresses "negligent treatment or maltreatment." Negligent treatment or maltreatment of a child means an act or omission that "evidences a serious disregard of consequences of such magnitude as to constitute a clear and present danger to a child's health, welfare, or safety." RCW 26.44.020(19).

A person named as an alleged perpetrator has the right to seek review and amendment of the founded finding. RCW 26.44.125(1). Upon receipt of a written request for review, management level staff from the Department must review the finding and may amend the finding if appropriate. RCW 26.44.125(4). If the finding remains founded, the alleged perpetrator may request an adjudicative hearing to contest the

finding.  RCW 26.44.125(5).  Adjudicative hearings are governed by the Administrative Procedure Act (APA), chapter 34.05 RCW.  RCW 26.44.125(5).

If an administrative law judge determines that the finding is founded by a preponderance of the evidence, they issue an initial order upholding the finding. WAC 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.  If a party disagrees with the initial order, they may appeal it to the Board of Appeals.  WAC 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.  Then, the Board enters a final order that affirms, changes, dismisses, or reverses the initial order.  WAC 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; 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.  A party may then petition for review of the final order in superior court.  WAC 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.  Pursuant to RCW 34.05.518, the superior court may certify cases for transfer to the Court of Appeals for direct review under certain circumstances.

The APA governs review of agency actions.  *Crosswhite v. Dep't of Soc. & Health Servs.*, 197 Wn. App. 539, 547, 389 P.3d 731 (2017).  We review the final order of the Board, rather than the initial order of the OAH.  *Verizon Nw., Inc. v. Emp. Sec. Dep't*, 164 Wn.2d 909, 915, 194 P.3d 255 (2008).  We will grant relief from an agency's final order only when at least one of nine statutory elements contained in RCW 34.05.570(3) is met.

Here, Ms. Kirkwood asserts the Board's order is not supported by substantial evidence, erroneously interprets and applies the law, and is arbitrary and capricious. RCW 34.05.570(3)(d), (3)(e), (3)(i).  Under the APA, the party asserting invalidity of the agency action bears the burden of showing the action is invalid.  RCW 34.05.570(1)(a).

13

We review findings of fact to determine whether there is "a sufficient quantity of evidence to persuade a fair-minded person of the truth or correctness of the order." *City of Redmond v. Cent. Puget Sound Growth Mgmt. Hr'gs Bd.*, 136 Wn.2d 38, 46, 959 P.2d 1091 (1998) (internal citation omitted). We review the evidence in the light most favorable to "the party who prevailed in the highest forum that exercised fact-finding authority." *City of Univ. Place v. McGuire*, 144 Wn.2d 640, 652, 30 P.3d 453 (2001) (internal citation omitted). "The APA's directive that we review whether an order is supported 'by evidence that is substantial when viewed in light of the *whole record* before the court' requires us to look beyond whether there is merely some evidence that supports the agency order." *Crosswhite*, 197 Wn. App. at 548 (quoting RCW 34.05.570(3)(e)). We defer to the review judge's witness credibility and weight of evidence determinations. *Spokane County v. E. Wash. Growth Mgmt. Hr'gs Bd.*, 176 Wn. App. 555, 565, 309 P.3d 673 (2013).

WHETHER SUBSTANTIAL EVIDENCE SUPPORTS THE BOARD'S FINDINGS

Ms. Kirkwood argues that the Board's finding that she neglected Delores by failing to protect her from Mr. Salamone was not supported by substantial evidence because the Department simply relied on Ms. Kirkwood's violation of RCW 9A.42.110. Ms. Kirkwood contends that the Department's reliance on a statutory violation absolved the Department of its responsibility to produce specific facts showing Mr. Salamone was a clear and present danger to Delores. We disagree with Ms. Kirkwood.

Ms. Kirkwood repeatedly argues that the Department relied solely on her violation of a statute prohibiting a parent from leaving a child with a registered sex offender unsupervised to show that she negligently treated or maltreated Delores. RCW 9A.42.110. But a review of the record demonstrates that the Department produced evidence Mr. Salamone was a registered sex offender, and that Ms. Kirkwood not only was aware of his status as a sex offender, but also knew that his prior victims were similarly situated to Delores, that Delores had recently reported sexual abuse, and that Ms. Kirkwood repeatedly left Delores in Mr. Salamone's care unsupervised.

Further, the final order mentions RCW 9A.42.110 primarily in the context of explaining that Ms. Kirkwood had previously signed a letter acknowledging that she knew leaving Delores with Mr. Salamone unsupervised was a crime. The other instances where RCW 9A.42.110 is mentioned in the final order are in regard to Mr. Sanders's testimony that Ms. Kirkwood "was aware of the prohibition in RCW 9A.42.110," that her argument of remaining on the phone with Mr. Salamone during his car rides with Delores ignored "the plain language of RCW 9A.42.110," and that she "discounted information that conflicted with what she wanted to do such as the information regarding the statutory prohibition in RCW 9A.42.110 and the advice of her mother." AR at 13, 31, 32. There is no evidence that the Board relied solely on Ms. Kirkwood's violation of RCW 9A.42.110 in reaching its decision. Instead, the Board's decision was based on the entire record before it.

15

Turning to the Board's final decision, it found "Mr. Salamone posed a clear and present danger to [Delores] because of his criminal history," and Ms. Kirkwood's "failure to appreciate the danger posed to [Delores] by Mr. Salamone showed a serious disregard of the consequences to the child of such magnitude that it created a clear and present danger to [Delores's] health, welfare, or safety." AR at 32.[2]

These findings are supported by substantial evidence and support the Board's conclusion that Ms. Kirkwood "negligently treated or maltreated [Delores] . . . when she continued to allow unsupervised contact between [Delores] and Mr. Salamone after learning of Mr. Salamone's history as a sex offender." AR at 33. They also support the conclusion that Ms. Kirkwood showed a "serious disregard of the consequences of [Delores] of such magnitude to create a clear and present danger to the child's health, safety, or welfare." AR at 33.

The record reflects that Mr. Salamone was a level one registered sex offender and had previously been convicted of rape of a child, child molestation, and indecent liberties. It also reflects that two of Mr. Salamone's victims were his stepchildren and that his victims were between the ages of 8 and 14. Delores was between the ages of four and six during the time period that Mr. Salamone had supervised and unsupervised contact with

---

[2] The "Conclusions of Law" begin on page 27 of the Board's decision and final order. AR at 27. However, portions of these conclusions are actually findings of fact. A finding of fact mislabeled as a conclusion of law will be treated as a finding of fact. *State v. Marcum*, 24 Wn. App. 441, 445, 601 P.2d 975 (1979).

her. Delores was of similar age and relationship to Mr. Salamone's previous victims. Given the evidence, Mr. Salamone's unsupervised time with Delores posed a clear and present danger to her. The Board's findings to this effect is supported by substantial evidence.

The record also shows that Ms. Kirkwood was aware of Mr. Salamone's sex offender status and past crimes. Ms. Kirkwood was aware that Mr. Salamone had sexually offended his stepchildren when they were of similar age to Delores and that, statutorily, she was precluded from leaving Delores in the care of Mr. Salamone unsupervised. Nevertheless, Ms. Kirkwood allowed Mr. Salamone unsupervised time with Delores while driving her to and from school and in allowing him to spend the night at her home while Delores was present. Moreover, Ms. Kirkwood shared a hotel room with Mr. Salamone while Delores slept in the same room during their trip to Disney World.

Ms. Kirkwood's presence on the phone with Delores and Mr. Salamone while Mr. Salamone drove Delores to and from school was insufficient to protect Delores. There was little Ms. Kirkwood could do to intervene had Mr. Salamone abused Delores in the car. Further, the phone connection could have been lost, or Mr. Salamone could have simply hung up. Substantial evidence supports the finding that Ms. Kirkwood failed to appreciate the danger Mr. Salamone posed to Delores and that her actions presented a

clear disregard of the consequences to Delores thereby creating a clear and present danger to her health.

To support her argument that the Department did not meet its burden of proving negligent treatment or maltreatment, Ms. Kirkwood cites to *Brown v. Department of Social & Health Services*, 190 Wn. App. 572, 360 P.3d 875 (2015), and argues there was no clear and present danger to Delores posed by her unsupervised contact with Mr. Salamone. In *Brown*, when applying the definition of "neglect of a child," this court held that a parent's conduct must be more than simple negligence. *Id.* at 593. Under the standard promulgated in *Brown*, the Department must show not just that a parent failed to act reasonably, but that the parent had a "higher degree of culpability" because it took an action that "involves a high degree of probability" that the child would be substantially harmed. *Id.* at 590.

The holding in *Brown* does not favor Ms. Kirkwood. Indeed, as discussed above, Ms. Kirkwood not only failed to act reasonably, she deliberately took an action that involved a high probability that Delores would be harmed. Ms. Kirkwood left Delores, unsupervised, in the care of a registered sex offender who had sexually offended against children of similar age and relationship as Delores. Further, Delores was particularly vulnerable as she had recently disclosed sexual abuse by her father. Ms. Kirkwood's actions amounted to far more than just simple negligence.

Ms. Kirkwood also cites *In the Matter of the Dependency of M.S.D.*, 144 Wn. App. 468, 182 P.3d 978 (2008), to argue that Mr. Salamone did not pose a clear and present danger to Delores. In *M.S.D.*, the mother's boyfriend had recently served a prison term for assaulting his two-month-old baby. *Id.* at 471. However, M.S.D.'s mother was under the impression that her boyfriend had assaulted the baby's mother. *Id.* After her boyfriend moved in with her and her children, including M.S.D., she learned that the assault was on her boyfriend's two-month-old baby, but believed the boyfriend when he said that it was the baby's mother who had actually committed the assault. *Id.* Later, the trial court found M.S.D. dependent, based on former RCW 13.34.030(5)(b) (2003), which defined a dependent child as one who is "'abused or neglected as defined in chapter 26.44 RCW by a person legally responsible for the care of the child.'" *Id.* at 478 (quoting RCW 13.34.030(5)(b)). We reversed because substantial evidence did not show the boyfriend's decades old conviction for assault constituted a clear and present danger to M.S.D. *Id.* at 482-83. We held that evidence of a mother who lived for several years with a boyfriend who had a prior conviction for assaulting his infant child was insufficient, by itself, to establish the mother's child had been neglected within the meaning of former RCW 13.34.030(5)(b). *Id.* at 481.

In *M.S.D.*, the boyfriend had not physically abused M.S.D. or any other child during the period of cohabitation, the mother was able to protect M.S.D., and she did not leave M.S.D. in the boyfriend's care. *Id.* at 482. Further, the court recognized that the

boyfriend's prior conviction was for assaulting an infant, while M.S.D. was seven years old at the time of the dependency proceedings. *Id.* at 470, 481.

*M.S.D.* is distinguishable. Here, within one month of commencing a relationship with Mr. Salamone, Ms. Kirkwood became aware that Mr. Salamone was a registered sex offender and that he had sexually offended against his young stepchildren. Further, Ms. Kirkwood left Delores unsupervised in Mr. Salamone's care by allowing him to drive her to and from school. Moreover, Delores was of similar age and relationship to Mr. Salamone's prior victims. The Board's findings are that Mr. Salamone posed a clear and present danger to Delores is supported by substantial evidence.

Finally, Ms. Kirkwood takes exception to portions of Mr. Sanders's testimony, arguing that he did not understand the meaning of negligent treatment or maltreatment, serious disregard, or clear and present danger. Even if Ms. Kirkwood is correct, when viewing the entire record, substantial evidence supports the Board's findings. It is immaterial that a lay witness did not properly recite the legal definition of "negligent treatment or maltreatment." *M.S.D.*, 144 Wn. App. 468 at 479. Ultimately, application of the appropriate legal standard rests with the Board.

WHETHER THE BOARD APPLIED THE PROPER LEGAL STANDARD

Ms. Kirkwood argues that the Board created a new standard for negligent treatment or maltreatment in disregard of the applicable statute. We disagree.

20

Our review under RCW 34.05.570(3)(d)[3] is de novo to determine whether the agency decision contains a legal error. *Kittitas County v. E. Wash. Growth Mgmt. Hr'gs Bd.*, 172 Wn.2d 144, 155, 256 P.3d 1193 (2011).

Ms. Kirkwood argues that the Board set forth a strict liability standard in concluding that Mr. Salamone's crimes, although 30 years old, made him a clear and present danger to Delores. She argues that no matter how old a person's sex crime conviction, under the standard promulgated by the Board, that person poses a clear and present danger to a child left alone with that person.

Ms. Kirkwood fails to appreciate the unique circumstances that made Mr. Salamone a clear and present danger to Delores. It was not Mr. Salamone's past crimes *alone* that made him a clear and present danger to Delores. Instead, it was the similarity in age and relationship of Delores to Mr. Salamone's prior victims, Delores's recent allegation of sexual abuse by her father, and the seriousness of Mr. Salamone's prior convictions. Indeed, the Board, in its findings, found that "Mr. Salamone is a registered sex offender. His victims were children. His crimes occurred in the 1980s when he was a mature adult with a job and family. He victimized his own stepchildren and five years later victimized another child." AR at 30. The Board further noted:

---

[3] "The agency has erroneously interpreted or applied the law. . ." RCW 34.05.570(3)(d).

> [Ms. Kirkwood] argued that Mr. Salamone's crimes are old and there is no evidence of new charges; therefore, there was no clear and present danger to [Delores]. The charges are thirty years old but they are very serious. Mr. Salamone victimized three children and five years later, victimized a fourth child . . . [Delores] was very young and particularly vulnerable because of the . . . abuse by her father and the feelings of trust she had for Mr. Salamone.

AR at 33.

There is no evidence that the Board applied a new or incorrect standard to the present case. Instead, the Board based its decision on the particular facts of this case.

Ms. Kirkwood next argues that the Board shifted the burden to her to disprove negligent treatment or maltreatment of Delores. This argument assumes that "Mr. Salamone's criminal history was dispositive," and that there was "no evidence that the risk to [Delores] was unreasonable, or that there was a high degree of probability" that harm would result. Am. Br. of Appellant at 47-48. As discussed above, Mr. Salamone's criminal history was not dispositive, and there was adequate evidence that harm would befall Delores if left alone in the care of Mr. Salamone. As Ms. Kirkwood points out, "the requirement of the WAC deals with the risk posed by Mr. Salamone." Am. Br. of Appellant at 49. The Board recognized this in its decision. The decision focused on just that—the risk posed to Delores by unsupervised contact with Mr. Salamone.

Finally, Ms. Kirkwood argues that the Board created a new standard that Mr. Salamone staying the night in her home with Delores present constituted negligent

treatment or maltreatment. However, Ms. Kirkwood recognizes that it is unclear whether the Board held that Mr. Salamone staying the night with Delores present constituted neglect. There is no mention of Mr. Salamone's overnight visits while Delores was present in Ms. Kirkwood's home in the conclusions of law in the Board's decision and final order. Instead, the Board stated it was the "unsupervised contact between [Delores] and Mr. Salamone after [Ms. Kirkwood] learn[ed] of Mr. Salamone's history as a sex offender" that justified the founded finding of negligent treatment or maltreatment. AR at 33. Forsooth, some of that "unsupervised contact" could have been while Ms. Kirkwood was asleep. AR at 33. However, there is no evidence that the Board's decision was based on the sleepovers alone.

The Board applied the correct legal standard when it concluded that Mr. Salamone posed a clear and present danger to Delores based on the unique facts of this case.

WHETHER THE BOARD'S DECISION WAS ARBITRARY AND CAPRICIOUS

Ms. Kirkwood argues, in passing, that the Board's decision and final order was "arbitrary and capricious." *E.g.* Am. Br. of Appellant at 49, 64. We decline to review this contention due to Ms. Kirkwood's lack of reasoned argument.

Ms. Kirkwood does not devote adequate argument to the issue of whether the Board's decision was arbitrary and capricious. In the issues pertaining to assignments of error portion of her brief, Ms. Kirkwood states, "Whether the Final Order in finding" negligent treatment by maltreatment may have been "arbitrary and capricious." Am. Br.

of Appellant at 4.  But, Ms. Kirkwood only twice mentions the phrase "arbitrary and capricious" in her brief.  Am. Br. of Appellant at 49, 64.  Ms. Kirkwood does not discuss the standard of review applicable to a challenge based on a decision being "arbitrary and capricious."  *Id.*  For these reasons, we decline to address the argument.  *State v. Stubbs*, 144 Wn. App. 644, 652, 184 P.3d 660 (2008) ("Passing treatment of an issue or lack of reasoned argument is insufficient to allow for our meaningful review."), *rev'd on other grounds*, 170 Wn.2d 117, 240 P.3d 143 (2010).

CREDIBILITY DETERMINATIONS, CHARACTERIZATION OF TESTIMONY, AND EVIDENTIARY RULINGS

Ms. Kirkwood argues the Board's credibility finding of her testimony was actually an attempt to resolve an ambiguity, that the Board mischaracterized her and Mr. Salamone's testimony, and that the Board erred by rejecting previously accepted hearsay.  We disagree with each of Ms. Kirkwood's arguments.

*Credibility Determinations*

Ms. Kirkwood argues the Board's credibility finding was actually an attempt to resolve an ambiguity.  We decline to explore the Board's credibility finding further since we defer to the Board's witness credibility and weight of evidence determinations. *Spokane County*, 176 Wn. App. at 565.

In its "Credibility Findings," the Board found there was "inconsistency in [Ms. Kirkwood's] testimony regarding whether Mr. Salamone spent the night" at her home when Delores was present.  AR at 26.  The Board concluded that it was "more

24

likely than not that Mr. Salamone spent occasional nights at [Ms. Kirkwood's] home"

when Delores was present. AR at 29. In other words, the Board did not find credible

Ms. Kirkwood's testimony that Mr. Salamone did not spend the night when Delores was

present.

Essentially, there is no remarkable difference between resolution of an

inconsistency or a credibility finding as either requires the fact finder to favor one

account over another. In any event, Ms. Kirkwood first testified that when Mr. Salamone

spent the night, Delores stayed at her grandmother's house.

Following her testimony that she did not recall Mr. Salamone spending the night

when Delores was present, Ms. Kirkwood stated, "if he did [spend the night], um, the

precaution, I—I remember in my head was, the floor creaked in the kitchen and it was

very loud—." 2 RP (Mar. 14, 2019) at 155. Later, Ms. Kirkwood testified that

Mr. Salamone slept over "maybe once or twice when [Delores] was there." 3 RP (Mar.

15, 2019) at 32. The Board found that it was more probable than not that Mr. Salamone

spent the night while Delores was also in the home. We will not disturb this credibility

finding.

*Characterization of Ms. Kirkwood's Testimony*

Ms. Kirkwood alleges the Board mischaracterized her testimony when it found:

"Ms. Kirkwood allowed Mr. Salamone to drive [Delores] to/from school because one of

Mr. Salamone's victims was 14 and the charge was oral sex. [Delores's] situation was

25

very different as she was much younger than 14 and was not disclosing oral sex in her

allegations about her father. *Testimony of Jessica Kirkwood*." AR at 123. Ms. Kirkwood

testified:

> Q. And yet you—and yet you made the decision—given her
> allegations, you made the decision to have a man around her that had the
> same kinds of, um, uh, convictions—or the same kinds of concerns with his
> own children.
> A. Well, see, that's where I differ on that. What I understand is he
> performed oral sex on the 14-year old. Um, [Delores] is nowhere near a 14-
> year old. Um, [Delores] never disclosed anything regarding oral sex.
> . . . .
> Q. —and you can, uh, yeah. Um, so he was driving her back and forth
> to school, right?
> A. Yes.

2 RP (Mar. 14, 2019) at 73-74. The Board's finding is not a mischaracterization of

Ms. Kirkwood's testimony. Ms. Kirkwood testified she did not think Mr. Salamone's

offenses were of similar nature to those being reported by Delores at the hands of her

father, or that Delores was of similar age to Mr. Salamone's prior victims. These

perceptions caused her to not have major concerns about Mr. Salamone being in the

presence of Delores or driving her to school. Even if we were to conclude the Board

mischaracterized Ms. Kirkwood's testimony, the Board's overall conclusion is still

supported by findings that are supported by substantial evidence.

*Characterization of Mr. Salamone's Testimony*

Next, Ms. Kirkwood takes exception to some of the Board's findings pertaining to

Mr. Salamone, referring to them as "snide." Am. Br. of Appellant at 64. The challenged

findings are that Mr. Salamone "believes he no longer has an addiction to cocaine," that Mr. Salamone "believes the therapy he received after his second offense rehabilitated him," and that Mr. Salamone "still uses marijuana regularly." AR at 25.

These findings are essentially reiterations of Mr. Salamone's testimony. Ms. Kirkwood takes issue with the Board's use of the word "believes" when referring to Mr. Salamone's testimony regarding his cocaine usage. Mr. Salamone testified that he had not used cocaine since the 1980s and that he no longer uses it. It is unclear why the Board's use of the term "believes" was "snide" when it was reiterating Mr. Salamone's own testimony. Am. Br. of Appellant at 62. Indeed, it appears from his testimony that Mr. Salamone himself does not believe he currently has an addiction to cocaine.

Ms. Kirkwood again takes issue with the Board's use of the term "believes" to summarize Mr. Salamone's testimony that sex offender treatment rehabilitated him. Mr. Salamone testified that therapy helped him in "knowing what [he] did and its impact." 3 RP (Mar. 15, 2019) at 102. Again, Mr. Salamone's testimony was that he thought sex offender treatment helped rehabilitate him.

Finally, Ms. Kirkwood takes issue with the Board's finding that Mr. Salamone uses marijuana "regularly." AR at 25. Mr. Salamone testified that he uses marijuana "some -- sometimes on weekends, yeah, I smoke it." 3 RP (Mar. 15, 2019) at 97. Even if the use of the term "regularly" was erroneous, the Board's decision is not erroneous simply because it may have used an incorrect adverb.

*Evidentiary Rulings*

Finally, Ms. Kirkwood argues the Board erroneously rejected hearsay that the

OAH had previously considered.

Before the OAH, Ms. Kirkwood testified about what a detective had told her about

sex offenders and sex offender restrictions.  She testified:

> A.  And so I went there actually and spoke with, um, one of the ladies,
> one of the detectives. I can't remember her name though. But that was, um,
> approximately in April or May, um, of 2016 that I met with her with him
> and asked her directly about, um, restrictions, um, and, uh, you know, is he
> at risk right now, do you consider him, you know, high risk for, you know,
> such-and-such. And, um, it was explained to me that he has not reoffended.

2 RP (Mar. 14, 2019) at 128.  A hearsay objection was lodged.  The OAH overruled the

objection. Ms. Kirkwood then further testified:

> A.  Um, so she explained that, uh, he gets, uh—someone checks on him
> once a year. That's the lowest level that they have. Um, that as far as, uh,
> risks, um, once someone goes past the five-year mark, after each year their
> risk decreases from that point statistically. Um, that he, uh, is more than
> eligible to, uh, petition to get off the registered sex offender list because of,
> um, the length of the crime being 30 years ago, um, and not reoffending
> since. . . .

2 RP (Mar. 14, 2019) at 129.

In its findings, the Board wrote:

> 5.6  Hearsay is a statement made outside of the hearing used to
> prove the truth of what is in the statement. WAC 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(2);
> WAC 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(3). While hearsay evidence would not ordinarily be
> admissible in superior court, it can be admitted in an administrative hearing
> so long as it is the kind of evidence on which reasonably prudent persons
> are accustomed to rely in the conduct of their own affairs. RCW 34.05.452.
> The Appellant provided multiple hearsay statements of the unnamed
> Thurston County Sheriff's office detective and the adult children of Mr.

> Salamone. The Department was not able to contradict these statements as these individuals were not present for questioning. Mr. Salamone provided hearsay statements of the SOR staff. Again, these individual(s) were not present for questioning. None of these hearsay statements are considered as proof of the truth of the statements. They are considered solely as elements of the Appellant's thought process in determining the risk to [Delores].

AR at 29-30.

Importantly, the Board's review of the OAH is de novo. WAC 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. This was recognized by the Board in its final order. Given the standard of review, the Board was entitled to reject hearsay statements that it did not find were the type that "reasonably prudent persons are accustomed to rely on in the conduct of their affairs." RCW 34.05.452(1).

We decline to disturb the Board's credibility determination. Further, the Board did not mischaracterize Ms. Kirkwood's testimony or erroneously reject previously accepted hearsay.

ATTORNEY FEES

Ms. Kirkwood requests her attorney fees and costs pursuant to RCW 4.84.350(1). RCW 4.84.350(1) provides:

> Except as otherwise specifically provided by statute, a court shall award a qualified party that prevails in a judicial review of an agency action fees and other expenses, including reasonable attorneys' fees, unless the court finds that the agency action was substantially justified or that circumstances make an award unjust.

Because Ms. Kirkwood is not the prevailing party, and therefore the Board's decision was substantially justified, we decline her request for attorney fees and costs.

29

No. 39529-4-III
*Kirkwood v. DCYF*

Affirmed.

A majority of the panel has determined this opinion will not be printed in the

Washington Appellate Reports, but it will be filed for public record pursuant to

RCW 2.06.040.

_____
Cooney, J.

WE CONCUR:

_____
Fearing, J.

_____
Pennell, J.

30